**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 96-50340**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**SHANNON KNOX; DAVID BRACE,**

**Defendants-Appellants.**

---

Appeals from the United States District Court
for the Western District of Texas

---

May 1, 1997

Before POLITZ, Chief Judge, DeMOSS, Circuit Judge and JUSTICE,[1] District Judge.

DeMOSS, Circuit Judge:

A preacher and his financial advisor were caught in a government sting designed to snare money launderers. Both raised entrapment at trial, but the jury rejected the defense and they were convicted of laundering drug proceeds. Because the government failed to prove that the preacher was likely to engage in money

---

[1]District Judge of the Eastern District of Texas, sitting by designation.

laundering absent the government's conduct, we hold that he was entrapped as a matter of law.

## BACKGROUND

Defendant/Appellant Reverend David Brace was pastor of the Faith Metro Church in Wichita, Kansas. Faith Metro had financial difficulties and, by late 1993, was heavily in debt. The church had to pay over $60,000 per month in debt service and needed to raise $10 million to pay its bondholders and other creditors. In an effort to raise money, Brace hired a Houston financial consulting firm First Diversified Financial Services, in early 1994. Brace met with Mike Clark, the president of First Diversified, and Clark's assistant, 24-year-old Defendant/Appellant Shannon Knox. Brace paid First Diversified $75,000 to prepare a prospectus for a $10.8 million limited private offering by Faith Metro.

Under the terms of the prospectus, Faith Metro offered 432 units of senior secured notes bearing 12.5% interest. The units were $25,000 each, with a minimum subscription of two units ($50,000). If all units were sold, $10.8 million would be raised, of which $9.375 million went to the church. Payment on the notes would begin in September 1995 with quarterly payments of $337,500. Thus, interest of $112,500 accrued monthly on the notes. The church could begin repaying the principal any time after December

2

31, 1996, and the notes matured on December 31, 1999.  Thus, under the terms of the prospectus, Faith Metro would have use of $9.375 million for up to five years, accruing $112,500 per month in interest (paid quarterly), with the principal of $10.8 million due for repayment on December 31, 1999.

The first printing of the prospectus was on September 1, 1994.[2]  Knox sent the prospectus to approximately 40 broker dealers, and received responses from two.  The second printing of the prospectus was on December 1, 1994.  Copies were sent to 32 or 33 broker dealers, and Knox received responses from three.  None of these responses proved fruitful and, ultimately, no money was raised through the private offering.

In October or November 1994, Knox met Roy Clarkston, who worked for the Brazos Valley Small Business Development Center.  Clarkston had several clients in the Bryan-College Station area interested in private placements, so Clark, who was also at the meeting, gave Clarkston a copy of the Faith Metro prospectus.  In mid to late February 1995, Clarkston told Knox that he had several potential investors in San Antonio.  Clarkston told Knox that he knew them through his business dealings in South and Central America.  Brace was not present at any of these meetings and did not meet Clarkston until March 24, 1995.

At the same time Clark and Knox were seeking financing for

---

[2]Under the terms of the first prospectus, the interest rate was 10%.

Faith Metro, undercover federal agents were running an elaborate sting operation in San Antonio designed to catch money launderers. Beginning in October 1994, undercover agents from the United States Drug Enforcement Agency, the Internal Revenue Service, and United States Customs were involved in the operation. As part of the sting operation, undercover agents investigated Clarkston, who they suspected was a money launderer. The undercover agents told Clarkston that they were seeking to launder cocaine proceeds and requested his assistance. Clarkston suggested several long-term laundering schemes, including investing in a cattle business and a sports bar, but the undercover agents rejected the ideas, saying they were interested in short-term investments.

In early March 1995, Clarkston told the undercover agents that he had a "major big time guy," a church group, anxious to do business. At this time the undercover agents had no knowledge of Brace or Knox. On March 17, 1995, Clarkston met with the undercover agents in San Antonio and explained that he knew a minister who was interested in laundering cocaine funds, and that the preacher's representative, his financial advisor, was in town and anxious to meet with them. The undercover agents explained to Clarkston that they did not want innocent people involved in the business, and asked him if the minister knew they were cocaine traffickers and that the money would be cocaine proceeds. Clarkston replied that the preacher and the other person knew and

4

did not care.[3]

Later that day, Knox met with Clarkston and the undercover agents. Knox said that he was representing Brace and that he was there to negotiate a deal. Early in the conversation, the undercover agents told Knox that the money was from drug proceeds; Knox said that this was not a problem.[4] Knox showed the prospectus to the undercover agents, who indicated that they might be able to lend Brace $3 million.

On March 24, the undercover agents met Brace for the first time at a meeting also attended by Knox and Clarkston. The undercover agents told Brace that they would be able to loan him the entire $10 million, not just the $3 million previously discussed. To make sure that Brace and Knox could handle such a large sum, the undercover agents told them that they would have a practice transfer of $100,000, a condition to which Brace readily agreed. The undercover agents then informed Brace that the money came from the sale of cocaine, and that he was being asked to

---

[3]Clarkston did not testify at trial; instead, one of the undercover agents testified as to Clarkston's statements regarding Brace and Knox. Knox objects that Clarkston's statements are hearsay and should not have been admitted. We address this issue below.

[4]This conversation, unlike later ones, was not taped. Knox testified that the undercover agents did not tell him they were drug dealers. The veracity of the conversation, however, was a credibility issue for the jury.

5

launder it.[5]  Brace stated that he was not troubled by the money's source.[6]  At the end of the meeting, Brace said he was ready to start the test money, but the undercover agents told him to have patience.

Brace and Clarkston met with the undercover agents on April 26.  Before the meeting, Knox told the undercover agents that he and Brace had already "contrived a system" to quickly deposit and transfer the first $100,000.  At the meeting, the undercover agents gave Brace an account number for an undercover account in a London

---

[5]One of the undercover agents actually said, "he is asking you to launder money."  The government informed Brace that the money was from drugs only six pages into the transcript of the meeting.

[6]Brace stated that:

> [E]ven the last two days, my office called and let me know that someone in Kansas had, won the lottery and they gave our church 5,000 dollars.  Uh... I have monies that I know that come to the church.  I don't have a questionnaire... where these monies come from.

> ***

> I know I get monies... That are from sources that, uh, would be questionable.

> ***

> Uh, I ask, and it's important I think for you to know I, I prayed to God... I said God, because I wanted to know if I was supposed to do this...

> ***

> God said that... He helped put this, this together. So I feel comfortable because of that.

6

bank where Brace was to wire the $100,000 in the first test. Brace was given $100,000 in cash, which he wired to the English bank the next week.

On May 5, the undercover agents again met with Brace in San Antonio. The undercover agents suggested another $100,000 test, this time to a domestic account controlled by the undercover agents. Brace agreed to this, stating that to conceal the source of the money, he would carry it on his books as a loan. The undercover agents again gave Brace $100,000 in cash. As he counted it, he commented, "I have a feeling that neither one of you, have ever come across a pastor like me." Brace took the money and wired it the account.

Knox called one of the undercover agents on May 10. During the conversation, Knox mentioned that he "kn[e]w a couple of people that deserve a bullet," and inquired, "can we work on that." Knox then stated that "I got a couple of problems, that I'm trying to alleviate but if, uh they don't alleviate I, uh I might need some services of some kind," referring to having someone killed.[7]

On May 12, the undercover agents met with Brace, Clarkston and Knox, and delivered the cash for another test, this time $150,000. Four days later Brace and Knox wired the money to the English bank. The undercover agents told Brace and Knox that they would soon be

_____

[7]Knox never brought up the subject again, but the undercover agent questioned him about it often. Knox argues that it was plain error for the district court to admit the extrinsic evidence of Knox's solicitation of murder. We address this issue below.

ready to transfer the entire $10 million.

On June 21, the final meeting took place. The undercover agents met Brace and Knox in a San Antonio parking lot and gave them three canvas bags purportedly containing $10 million. The bags actually contained an amount of newspaper clippings approximating the weight of $10 million in cash. Brace and Knox were arrested as they left the parking lot.

Brace and Knox were charged with money laundering in a four count indictment.[8] In Count One, Brace and Knox were charged with conspiring to launder money in violation of 18 U.S.C. § 1956(h). In Count Two, Brace was charged with laundering $100,000, and aiding and abetting Clarkston, in violation of 18 U.S.C. §§ 2 and 1956(a)(2)(B)(i). In Count Three, Brace was charged with laundering $100,000 in violation of 18 U.S.C. § 1956(a)(3)(B). In Count Four, Brace and Knox were charged with laundering $150,000, and aiding and abetting each other, in violation of 18 U.S.C. §§ 2 and 1956(a)(2)(B)(i). After a jury trial, Brace and Knox were convicted on all counts and sentenced to 175 and 97 month imprisonment, respectively.

---

[8]Clarkston was also charged in the indictment, but pleaded guilty.

DISCUSSION

**Entrapment as a Matter of Law**

Brace argues that, as a matter of law, he was entrapped.[9] "Where the Government has induced an individual to break the law, and the defense of entrapment is at issue, . . . the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States*, 503 U.S. 551, 548-49 (1992). The government concedes that Brace was induced; therefore, the evidence must prove beyond reasonable doubt that Brace was predisposed to launder money. Because this is a sufficiency review, we will reverse only if no rational juror could have found predisposition beyond a reasonable doubt. *See United States v. Byrd*, 31 F.3d 1329, 1335 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1432 (1995).

The Supreme Court most recently addressed entrapment and predisposition in *Jacobson v. United States*, 503 U.S. 551 (1992).

> In *Jacobson*, government agents engaged in a campaign of phony mailings to induce a Nebraska farmer to violate the ban on child pornography contained in the 1984 Child Protection Act. After seven or eight mailings spanning 26 months, Jacobson succumbed and ordered an illegal magazine. The Supreme Court held as a matter of law that Jacobson had been entrapped. . . . Given the government's persistent encouragements, the Supreme

---

[9]In his brief, Knox does not argue that he was entrapped as a matter of law. Accordingly he waived the issue and we do not address it.

9

Court found that Jacobson's "ready response to these solicitations cannot be enough to establish beyond a reasonable doubt that he was predisposed, prior to the Government acts intended to create predisposition, to commit the crime."

*United States v. Sandoval*, 20 F.3d 134, 137 (5th Cir. 1994) (quoting *Jacobson*, 503 U.S. at 553). The Court summarized entrapment law, stating that "[w]hen the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Jacobson*, 503 U.S. at 553-54.

The en banc Seventh Circuit recently wrestled with the meaning of *Jacobson* in *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994) (en banc). Writing for the majority, Chief Judge Posner stated that in examining predisposition, we must ask ourselves what the defendant would have done, had the government not been involved. *See id*. at 1199-1200. To properly answer that question, we must look to more than the defendant's mental state; we must also consider the defendant's skills, background and contacts. As Chief Judge Posner explained, predisposition "has positional as well as dispositional force. The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so. . . ." *Id*. at 1200. A defendant may have the desire to commit the

10

crime, but may be without any ability to do so.  The defendant is able to commit the crime only when the government steps in and provides the means to do so.[10]  In those cases, we cannot say that, absent government involvement, the defendant would likely have committed the crime.

The facts of **Hollingsworth** illustrate the Seventh Circuit's point.  The **Hollingsworth** defendants were an orthodontist and a farmer, both from Arkansas.  The pair, who had attempted and failed at many business ventures, decided to become international financiers, "a vocation for which neither had any training, contacts, aptitude, or experience." **Id**. at 1200.  They secured two foreign banking licenses, one from Grenada, and attempted to make money.  Unfortunately, they had no customers and were rapidly going broke.  The orthodontist, deciding to raise capital by selling the Grenadan banking license, placed an ad in **USA Today** offering the license for $29,950.

A Customs agent saw the ad and, "[k]nowing that foreign banks are sometimes used for money laundering, . . . assumed that someone who wanted to sell one would possibly be interested in money laundering." **Id**. (internal quotation omitted).  The agent, acting

---

[10]We echo the Seventh Circuit's statement that "lack of *present* means to commit a crime is alone [not] enough to establish entrapment if the government supplies the means." **Hollingsworth**, 27 F.3d at 1202 (emphasis in original).  Instead, we are only speaking of individuals who, but for the government's inducement, likely would not commit the offense. **Id**. at 1202-03.

undercover, contacted the orthodontist and, ultimately, persuaded him to launder money.  The orthodontist and farmer were convicted of money laundering.

The en banc Seventh Circuit reversed, stating that, "[h]ad the government left [him] 'to his own devices' . . . in all likelihood [the orthodontist], a middle-aged man who so far as anyone knows had never before committed any crime, would never have committed a money-laundering or related offense."  *Id*. at 1201-02 (quoting *Jacobson*, 503 U.S at 553).  The government "turned two harmless, though weak, foolish, . . . and greedy, men into felons." *Id*. at 1202.  Chief Judge Posner made clear that "[w]hatever it takes to become an international money launderer, they did not have it." *Id*.  "Even if they had wanted to go into money laundering before they met [the agent,] . . . the likelihood that they could have done so was remote.  They were objectively harmless." *Id*.  It was "highly unlikely that if [the agent] had not providentially appeared someone else would have guided them into money laundering. No real criminal would do business with such [novices]." *Id*. at 1203.

We recognize that the Seventh Circuit's reading of *Jacobson* has not been universally embraced.  The Ninth Circuit has rejected the Seventh Circuit's positional predisposition requirement and the First Circuit has adopted a different test. *See **United States v. Thickstun***, 1997 WL 152744, *4 (9th Cir. April 3, 1997); ***United***

12

*States v. Gendron*, 18 F.3d 955, 962-63 (1st Cir. 1994); *see also*

*Hollingsworth*, 27 F.3d at 1211 (Easterbrook, J., dissenting)

(criticizing positional predisposition requirement). In *Gendron*,

then Chief Judge (now Justice) Breyer held that *Jacobson* stands for

the proposition that in trying to induce the target of a sting to

commit a crime, the government may not confront him with

circumstances that are different from the ordinary circumstances a

real criminal would use in inducing one to engage in wrongdoing.

*See Gendron*, 18 F.3d at 962 (proper inquiry for predisposition is

"how the defendant likely would have reacted to an ordinary

opportunity to commit the crime"); *Thickstun*, 1997 WL 152744, at *4

(following *Gendron*). Thus, the government must show that a

defendant would have committed the crime when "faced with an

ordinary `opportunity' to commit the crime rather than a special

`inducement.'" *Id*. at 963.

Nonetheless, we are persuaded that the Seventh Circuit's

*Hollingsworth* decision is correct.[11] *See* Paul Marcus, *Presenting*

---

[11]In this case, the result would not differ under the First
Circuit's *Gendron* test. The government failed to prove that real
drug dealers would provide the same, or even similar, terms to a
launderer as the undercover agents offered Brace. Thus, the
government failed to offer any evidence that Brace would accept an
"ordinary opportunity" to launder money.

Under the deal worked out between Brace and the undercover
agents, Brace would have the use of $10 million for four years. He
would pay back $50,000 a month for the first two years, and then
$100,000 for the last two. At the end of four years, a balloon
payment of $6.4 million would be due. The money would be paid back

*Back From the [Almost] Dead, the Entrapment Defense*, 47 F<span>LA</span>. L. R<span>EV</span>. 205, 233-34 (1995) (arguing **Hollingsworth** is proper approach to

---

without interest. With the undercover agents' approval, Brace would use the money to pay the church's debts. This arrangement was similar to Brace's proposal in the prospectus, except the payments were lower and there was no interest.

This structuring was necessary to Brace's participation. Brace had pressing financial needs and needed to restructure his debts. He needed the use of $10 million for several years. Had the laundering of the $10 million been structured the same as the test amounts, the scheme would have offered no benefit to Brace. Under the tests, Brace had to immediately wire the money, and thus could not use it. Without use of the money for several years, Brace had no incentive to launder money. Therefore, without the deal being structured as it was, Brace would not have laundered money.

The government presented no evidence as to what is involved in an ordinary opportunity to launder money. Perhaps real drug dealers regularly give launderers the interest free use of millions of dollars for several years, with low monthly payments and a large balloon payment. If that is the case, then we can infer that Brace would accept an ordinary opportunity to launder drug proceeds. But, it seems just as likely that real drug dealers would not want their money tied up for years, with only token payments coming back at first. It also seems just as likely that real drug dealers would not allow a launderer to use $10 million in to-be-laundered cash to pay off current debts, hoping that an income stream was available to pay them back. Instead, real drug dealers might only give the cash as needed, and ask that it be laundered immediately, so that the launderer receives no benefit from the use of the money, as in the tests. If the latter scenario is how real drug dealers operate, then Brace would likely not have accepted an ordinary opportunity to launder money.

The fact is that we do not know what constitutes an ordinary opportunity to launder money. This is a subject on which the record is silent. Because the record does not show what is an ordinary opportunity to launder money, it follows that it provides no support for the proposition that Brace would accept an ordinary opportunity to launder money. Because predisposition is an issue on which the government bears the burden of proof, we would hold that, under the First Circuit's test, the evidence is insufficient to conclude that Brace was predisposed to launder money.

14

entrapment law). The Supreme Court instructs that in determining predisposition we are to ask what the defendant would have done absent government involvement. To give effect to that command, we must look not only to the defendant's mental state (his "disposition"), but also to whether the defendant was able and likely, based on experience, training, and contacts, to actually commit the crime (his "position").

We are called upon to determine whether the government proved beyond a reasonable doubt that Brace was predisposed to launder money. Following **Hollingsworth**, we look to Brace's position, as well as his mental disposition. The evidence of Brace's mental disposition to launder money is close. Nonetheless, we must reverse because the government failed to prove that Brace, absent government involvement, was in a position to launder money. Therefore, the evidence is insufficient to prove that Brace was predisposed to launder money.

The government argues that the evidence shows that Brace was predisposed to launder money. The government, however, fails to address the positional and dispositional aspects of pre-disposition.[12] All of the evidence the government adduced at trial went solely to Brace's mental disposition. The government offered no evidence that Brace was in a position to launder money. The

---

[12]In fact, in its brief, the government fails to even cite **Hollingsworth,** let alone deal with it substantively.

15

government offered no evidence that real drug dealers would use a novice such as Brace to launder money. Brace had never been convicted of a crime, and, as far as the record shows, had never committed a crime worse than speeding before he met the undercover agents. The evidence shows that Brace certainly had never laundered money before, and knew little, if anything, about the subject. In fact, he had to send an associate to the library to figure out the mechanics of laundering money. It is possible that real drug dealers often use such ignorant and naive individuals to launder millions of dollars. If that is the case, the government offered no proof of it.

The government failed to prove that real drug dealers would use a church to launder money. The only evidence that a church might be useful in money laundering came when Brace's counsel was cross-examining one of the undercover agents. When asked whether a real drug dealer would use someone who "didn't know what the hell he was doing," and "was totally inefficient," the undercover agent responded that:

> [P]erhaps, perhaps not, depending on what he -- in the whole gist of the thing, the fact that he had a church, that was golden to me. That would have been golden because nobody looks at a church.

This statement is too vague and non-committal to be evidence of anything. The undercover agent says "perhaps, perhaps not," and then says that a church would be "golden" to *him*, not whether a real drug dealer would find it so.

16

The government never adduced evidence that a church would be valuable in money laundering, or that a church has ever been used in money laundering. The only evidence the government offered on the subject established that no church has ever knowingly been used to launder drug money. On cross-examination of Knox, the Assistant United States Attorney ("AUSA") asked whether Knox could "identify even a single church company in the United States that's ever knowingly taken purported drug proceeds." Knox responded that he had no information regarding that, and the AUSA asked, "Never heard of that before?" To which Knox responded, "No, sir. Not thus far." It is possible that drug dealers regularly use churches to launder money, and that a willing, though inexperienced, pastor would be an invaluable asset. That, however, is not in the record, and this is an issue upon which the government bore the burden of proof. On the record before us, the government failed to prove that any church has ever been used to launder money, or that a church would even be useful in laundering money.

After examining the record, we must conclude that the government failed to prove that Brace was in a position to launder money. When we ask the question of what Brace would have done if he had never met the undercover agents, we cannot answer "launder money for real drug dealers." In all likelihood, Brace never would have laundered money, but instead would have missed his bond payments and been forced into bankruptcy, as ultimately happened. Because the government failed to establish that Brace would have

laundered money absent government involvement, the evidence is insufficient to prove predisposition.  Accordingly, we hold that Brace was entrapped as a matter of law, and his convictions must be reversed.[13]

**Entrapment Jury Instruction**

Knox argues that the district court erred in using the pattern jury instruction on entrapment after *Jacobson*.  Fifth Circuit Pattern Instruction No. 1.28.  We recently held that the entrapment pattern jury instruction is correct post-*Jacobson*.  *United States v. Hernandez*, 92 F.3d 309, 311 (5th Cir. 1996), *cert. denied*, 65 U.S.C.W. 3692 (April 14, 1997) (No. 96-7257).  Accordingly, his claim must fail.

**Hearsay as to Clarkston's Statement**

Knox argues that the district court erred in admitting Clarkston's hearsay statement.[14]  The undercover agent testified that on March 17, Clarkston told him that Brace and Knox knew, but did not care, that the undercover agents were cocaine traffickers and that the funds were cocaine proceeds.  The statement was

---

[13]Brace raises several other issues in his brief.  Because we reverse his convictions based upon the sufficiency of the evidence, we do not address those other issues.

[14]Brace does not raise this issue. Accordingly, we only consider the issue as it relates to Knox.

18

admitted under Federal Rule of Evidence 801(d)(2)(E) as "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." To support admission of an out of court statement under this provision, the proponent must show by a preponderance of the evidence that (1) a conspiracy existed; (2) the statement was made during the course and in furtherance of the conspiracy; and (3) the declarant and the defendant were members of the conspiracy. *United States v. El-Zoubi*, 993 F.2d 442 (5th Cir. 1993). Knox argues that there is no evidence that he or Brace were Clarkston's co-conspirator at the time the statement was made; thus, it was not made during the course of the conspiracy.

The evidence was sufficient for the district court to find by a preponderance of the evidence that the conspiracy existed at the time of Clarkston's statement. In determining whether a conspiracy exists, the district court is free to look at all evidence, including the putative hearsay statement. *See Bourjaily v. United States*, 483 U.S. 171, 175-180 (1987) (applying FED. R. EVID. 104(a)); *United States v. Triplett*, 922 F.2d 1174, 1181 (5th Cir. 1991). The evidence clearly established that Clarkston and Knox had previously met and were in contact with each other. On the morning of March 17, Clarkston told the agents that he had a preacher interested in laundering money and that his financial advisor was in town. Just a few hours later, Clarkston produced Knox and Knox agreed to launder money for the undercover agents.

19

Knox's quick arrival and ready agreement to launder could be read as evidence that he and Clarkston were already part of a conspiracy to launder money when Clarkston made the statement that morning. Considering this evidence, as well as Clarkston's statement that Knox knew the money was drug proceeds, yet did not care, the district court could have reasonably concluded that Clarkston and Knox were already part of a conspiracy to launder money. Thus, the statement was an admission of a co-conspirator and not hearsay.

### Admission of Evidence of Solicitation of Murder

Knox argues that the district court erred in admitting evidence regarding his solicitation of murder. Knox admits that he failed to object at trial; our review, therefore, is for plain error. We will correct plain error only if (1) there is error, (2) which is clear or obvious, (3) which affected substantial rights, and (4) which will seriously affect the fairness, integrity or public reputation of judicial proceedings if allowed to stand. *See* *United States v. Clements*, 73 F.3d 1330, 1337 (5th Cir. 1996); *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc). Therefore, our first task is to determine if there is error. *Calverley*, 37 F.3d at 162 ("There first must be error."). If we determine that the district court did not err in admitting the solicitation of murder evidence, then our inquiry need go no further.

20

The district court allowed evidence that Knox asked the undercover agents to kill someone.  Specifically, Knox told the undercover agents that he knew "a couple of people that deserve a bullet," and asked "can we work on that."  The next day, the undercover agents asked whether he still needed the hit, and Knox responded that his situation had not become a problem yet, but if it did, his "wrath is just going to be biblical."  The undercover agents raised the issue with Knox twice more.  Both times Knox said that he longer needed anyone killed.  The last time the issue was raised, Knox stated that his problem had abated, and "I don't have to get violent with anybody so I'm happy about that. . . .  [T]he other day I really didn't wanna have to go to extremes but I wanted to know I kinda had the ability to if I needed to."

Knox argues that this testimony is extrinsic evidence[15] (that is, evidence of other crimes) and should be inadmissible under Federal Rule of Evidence 404(b).[16]  "Extrinsic offense evidence is

---

[15]The government argues that the evidence of solicitation of murder is not *extrinsic*, but rather is *intrinsic* evidence, which is not governed by Rule 404(b).  *See* **United States v. Coleman**, 78 F.3d 154, 156 (5th Cir.), *cert. denied*, 117 S. Ct. 230 (1996).  Because there is no plain error either way, we assume, without deciding, that the evidence of solicitation of murder is extrinsic.

[16]Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent preparation, plan, knowledge, identity, or absence of mistake or

21

properly admitted under Rule 404(b) only if (1) it is relevant to an issue other than the defendant's character, and (2) its probative value is not substantially outweighed by its undue prejudice" under Federal Rule of Evidence 403.[17]  *United States v. Buchanan*, 70 F.3d 818, 831 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1340 (1996); *see also United States v. Route*, 104 F.3d 59, 63 (5th Cir. 1997); *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978).  Knox argues that the solicitation of murder is only relevant as to his character.  It is not relevant to whether he laundered money, but only serves to show that he is a bad man who deserves to be punished. We disagree.  Knox's defense at trial was entrapment.  The government, therefore, was required to prove beyond a reasonable doubt that Knox was predisposed to launder money.  The government did so by having Knox himself testify, via the undercover tapes, that he was experienced in drug trafficking and knowledgeable of criminal activity.  Through this evidence, and through Knox's solicitation of murder, the government sought to prove that Knox was predisposed to launder money.

---

accident. . . .

[17]Federal Rule of Evidence 403 provides that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

At trial, the jury essentially saw two Shannon Knoxes. The jury saw the Knox of the undercover tapes, the young man who told the undercover agents that his father was friends with a mafia hitman, and that as a young boy he had seen a man killed. The Knox of the undercover tapes told the undercover agents that he had experience in the drug business, and that two years earlier he "had a guy that was making a run to Cincinnati . . . and he had a Cincinnati connection to buy 'em three [kilograms of cocaine]." The Knox of the undercover tapes spoke knowledgeably about processing and dealing cocaine, and said that he knew the biggest drug dealer in Pasadena. The Knox of the undercover tapes told the undercover agents that he was not worried about federal undercover agents because he "figure[d] if you're going to get problems with the feds, they're easily purchased," and stated that he had "always had friends in the judicial system downtown that have always cleaned [him] up."

The Knox who testified at trial was a quite different figure. He claimed that all the things he had told the undercover agents were lies, that he was just "puffing" and "funnin'," so as to create a "level of comfort" with the putative Colombian drug dealers. He stated that he had no cocaine trafficking experience, other than buying small amounts for personal use, and that he had no Cincinnati connection. The Knox at trial stated that he did not know the biggest drug dealer in Pasadena, and that he had no friends in the judicial system who could help him out. He stated

23

that most of his knowledge of drug trafficking and the underworld came from "things seen in movies and read in books and magazines."

It was in this context that the government put on evidence that Knox solicited murder from the undercover agents. The government was attempting to show the jury that Knox was the man on the tapes, experienced in drug trafficking and the underworld, a man who would order a hit on an associate giving him trouble. The Knox of the undercover tapes was a man predisposed to launder money, while the Knox testifying at trial was an inexperienced innocent, whom the jury might think had no predisposition to launder. The jury was entitled to decide which picture of Knox was more credible, the one on the undercover tapes, or the one testifying at trial. By presenting evidence of Knox telling the undercover agents that he had some people "that deserve[d] a bullet," and that he might need some "services of some kind," the government could show the jury that the Knox of the undercover tapes was the real Knox. The jury could conclude that a person just "funnin'" would not solicit murder and, therefore, the real Knox was on the undercover tapes, not in the courtroom.[18]  If the jury believed the government's portrayal of Knox, it could infer that he was predisposed to launder money. The evidence, therefore, was relevant to the main issue at trial: predisposition.

Having determined that the solicitation of murder evidence is

----

[18]At trial, Knox explained away his comments by stating that he solicited murder for "no particular reason."

24

relevant to an issue other than Knox's character, we must next determine whether its probative value is substantially outweighed by the danger of unfair prejudice. Evidence of solicitation of murder is prejudicial to a defendant. *See*, *e.g.*, ***United States v. Limones***, 8 F.3d 1004, 1008 (5th Cir. 1993) (evidence of murder prejudicial); ***United States v. Fortenberry***, 860 F.2d 628, 632 (5th Cir. 1988) (evidence of violent crimes highly prejudicial). Nonetheless, Knox has not shown that the danger of unfair prejudice resulting from this evidence substantially outweighs its highly probative value. Testimony regarding solicitation of murder did not dominate the trial. In a seven day trial comprising over 1400 pages of trial transcript and hundreds of pages of undercover tape transcripts, references to Brace's solicitation of murder spans only a few pages. *Cf*. ***Fortenberry***, 860 F.2d at 632 (evidence of extrinsic offenses "occupied more of the jury's time than the evidence of the charged offenses"). After reviewing the record, we are not convinced that this evidence was likely to lead the jury to base its verdict on an improper basis. *See* Fed. R. Evid. 403 advisory committee's note; ***Fortenberry***, 860 F.2d at 632 (evidence likely to inspire emotional basis for verdict); ***United States v. McRae***, 593 F.2d 700, 707 (5th Cir. 1979) (noting that Rule 403's major function is only to exclude matters of slight probative force, "dragged in by the heels for the sake of prejudicial effect").

25

Because the extrinsic evidence of solicitation of murder was relevant to Knox's predisposition, and not just his character, and because the evidence's probative value is not substantially outweighed by the danger of unfair prejudice, the district court did not err in admitting the evidence regarding solicitation. Because there is no error, it follows that there is no plain error.

*Sentencing*

Knox argues that the district court erred in calculating his base offense level. The Guideline under which he was sentenced requires a three level decrease:

> [U]nless the defendant or a coconspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

U.S.S.G. § 2X1.1(b)(2). The commentary to the guideline states that:

> In most prosecutions for conspiracies or attempts, the object offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted. Sometimes, however, the arrest occurs well before the defendant or any co-conspirator has completed the necessary acts of the object offense. Under such circumstances, a reduction of 3 levels is provided under § 2X1.1(b)(1) or (2).

U.S.S.G. §2X1.1, comment. (backg'd.).

26

The district court denied the reduction, stating that "the three level decrease to the offense level is not warranted [] because the Defendants completed all the acts believed necessary on their part for a successful completion of the offense." Knox contends that the district court erred in denying the reduction because he had not taken all the acts necessary to launder the $10 million when he was caught. In fact, he argues, he was nowhere near ready to launder that amount of cash.

The district court's statement that Knox had completed all acts believed necessary for completion of the offense is a factfinding, which we review for clear error. *United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1002 (1997). "In making findings pursuant to the Sentencing Guidelines, a district court need only be convinced by a preponderance of the evidence." *Id*. "Factual findings are not clearly erroneous if they are plausible in light of the record read as a whole." *United States v. Ayala*, 47 F.3d 688, 690 (5th Cir. 1995). We will only hold a finding clearly erroneous if, considering the evidence as a whole, we are left with a definite and firm conviction that a mistake has been made. *See United States v. Acosta*, 972 F.2d 86, 90 (5th Cir. 1992).

Knox and Brace had previously laundered $350,000 in three tests. They had no difficulty laundering this amount, and always completed their task within the time limit set by the undercover

27

agents.  On the undercover tapes, Knox and Brace detailed their plans to launder the money over four years, which included mixing the cash in with offerings at Brace's church.  Knox argues that while he and Brace had plans to launder the money, none had been implemented.  For example, he had taken no steps to create the Cayman Islands corporation he had discussed.  The only method he had for laundering the funds was using cashiers checks, as had been done for the tests.  Knox argues that this plan was unworkable, because 33,000 cashier's checks would have been required to launder the $10 million.[19]

In similar circumstances, other circuits have approved factfindings that defendants completed all steps believed necessary.  For example, in **United States v. Barton**, 32 F.3d 61, 64 (4th Cir. 1994), the Fourth Circuit held that the factfinding of completion of "all steps believed necessary" was not clearly erroneous when a defendant merely accepted a suitcase of alleged drug money for delivery to his associate.  *See also* **United States v. Brown**, 74 F.3d 891, 893 (8th Cir.) (defendant need not have reached the "last step" before completion of the substantive offense), *cert. denied*, 117 S. Ct. 74 (1996).

---

[19]The cashiers checks had to be for less than $3000 in order to avoid triggering bank reporting requirements.

28

Reviewing the evidence as a whole, we do not have a definite and firm conviction that the district court made a mistake in finding that Knox had completed all steps he believed necessary to launder the $10 million. Accordingly, the district court did not err in denying the three point reduction under U.S.S.G. § 2X1.1(b)(2).

## CONCLUSION

The government failed to prove beyond a reasonable doubt that Brace would likely have laundered money absent the government's involvement. Accordingly, we hold that Brace was entrapped as matter of law, and his convictions and sentence on all counts are **REVERSED.** The district court did not err in admitting Clarkston's statement, or in admitting evidence regarding Knox's solicitation of murder. The district court did not err in refusing the three level decrease because Knox had not completed all steps necessary to launder the entire $10 million. Therefore, Knox's convictions and sentences are, in all respects, **AFFIRMED.**