**REVISED**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 96-20945
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

BILLY MAC THOMPSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

December 4, 1997

Before MAGILL,[*] SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Billy Thompson appeals his conviction of attempting to murder a federal judge.  We affirm.


I.

While in jail, Thompson solicited inmate Stephen Gerber to kill The Honorable Kenneth Hoyt, an able and respected judge of the United States District Court for the Southern District of Texas.

_____

[*] Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Judge Hoyt had sent Thompson to jail on a civil contempt charge related to a civil case in Judge Hoyt's court in which Thompson was a party. In jail, Thompson met Gerber and asked him to hire a hit man. Thompson expressed outrage that Hoyt had sent him to jail and was generally displeased with the way his litigation was proceeding in Judge Hoyt's court.

Gerber, an admittedly unsavory character, wrote letters to the FBI and to Judge Hoyt, alerting each of the threat Thompson posed. Thereafter, the FBI began an investigation. Together, the FBI and Gerber concocted a plan to catch Thompson. At the FBI's prompting, Gerber gave Thompson a phone number he could use to call someone who would kill Judge Hoyt for him.

When Thompson refused to use the number, because he did not want anyone to remember his voice, Gerber gave Thompson an FBI post office box number. He told Thompson that for $20,000SS$2,000 down and $18,000 after the hitSSGerber's agents would kill Judge Hoyt. All Thompson had to do was to have someone send $2,000 to the post office box.

Thompson contacted his sister and had her drive to a town thirty miles away. There, she sent four $500 money orders to the post office box via express mail; she signed the return address "Sam Jones."

Subsequently, the FBI arranged a taped conversation between Thompson and Gerber in the prison library. During the meeting, Thompson reiterated his desire to have Gerber's hit men "cuff [Judge Hoyt], chain his legs together, put weights on his feet and

2

dump his ass [in the ocean]." On the tape, Thompson acknowledged that he had had $2,000 sent to the post office box. When Gerber questioned whether Thompson would regret his decision or would seek to back out of the deal at the last moment, Thompson repeatedly stated that he would not.[1]

A few days after the first taped conversation, the FBI attempted a second tape-recorded colloquy between the two inmates. The tape recording device failed, however, producing only an electronic noise.[2]

At trial, Gerber maintained that Thompson's statements at the second meeting were consistent with those at the first. Thompson contends that the second conversation was exculpatorySSthat Thompson had reached a settlement in his civil case by that time and thus would have no reason to want to murder Judge Hoyt. Given this evidence, the government obtained an indictment on three charges: (1) using the mails to commit a murder for hire, in violation of 18 U.S.C. § 1958; (2) soliciting the murder of a federal judge, in violation of 18 U.S.C. §§ 373, 1114; and (3) attempting to kill a federal judge, in violation of 18 U.S.C.

---

[1] Before the first taped conversation, Gerber had received two handwritten notes cryptically referring to $2,000, the digging of a swimming pool, and Gerber's uncle. At trial, a government handwriting expert testified that the handwriting matched Thompson's. Gerber testified that the cryptic references related to Thompson's solicitation to have Gerber's agents kill Judge Hoyt.

[2] There were also mechanical difficulties with the first recorded conversation. In that conversation, there were two tape recordings: one on an independent recorder in the library and another on a device transmitting the conversation to FBI agents outside the prison. The latter tape failed when the transmitter was unable to send its signal through the thick prison walls. The former tapeSSafter government experts had enhanced itSSwas authenticated and entered into evidence.

§ 1114.

Thompson presented a two-pronged defense. First, his attorney adhered to a theory that Thompson had had his sister send $2,000 to the post office box in an effort to bribe a Supreme Court clerk to have his appeal docketed.[3]

Second, Thompson's attorney attacked the veracity and reliability of the government's key witnessSSGerber.[4] The defense called numerous witnesses to testify that Gerber was a liar, a conman, and generally not believable. Instead, the defense painted a picture of Gerber's blackmailing Thompson to make Thompson solicit Gerber to kill Judge Hoyt. Apparently, Gerber threatened that if Thompson withdrew from the agreement to harm Judge Hoyt, "serious mafia style harm" would befall Thompson's family.[5]

The government introduced enhanced tapes of the first recorded conversation between Gerber and Thompson and properly authenticated the original tape and the enhanced versions. The defense moved to suppress the recordings as unreliable, arguing that the tapes were inaudibleSSeven though enhancedSSand thus would lead to jury confusion. The court reviewed the enhanced tapes and the original and concluded that the enhanced tapes were, for the most part, audible and not unduly confusing. Consequently, the court admitted

---

[3] Thompson did not testify.

[4] Thompson's attorney also attempted to bolster Thompson's character by having relatives testify, for example, that he was "a good man" and "went to church."

[5] This theory seems to concede that there was an agreement between the two men to have Judge Hoyt murdered, and it does not suggest the agreement originally was the result of duress.

4

the enhanced recording for the jury's consideration.

The government also provided a transcript of the enhanced recording to aid the jury in listening to the tapes. The defense contested the introduction of the transcript, contending that the jury would be confused by the transcript and would use the government's transcriptSSrather than the tapeSSto make its decision. Thompson also proffered that the government's transcript was inaccurate.

The court instructed the jury that the tapeSSnot the transcriptSSwas the evidence for its consideration and that any inconsistencies it found between the two should be resolved in favor of the tape. Moreover, the court told the jury that it was to use the transcript only when listening to the tape. Thompson never introduced his own transcription to rebut the alleged inaccuracies in the government's version.

## II.

### A.

"Admission of tape recordings falls within the 'sound discretion' of the trial court."[6] We will reverse a decision to admit such evidence only if the court abuses its discretionSSthat is, if it relies on an incorrect view of the law or on clearly erroneous factual findings. We also review the decision to admit

---

[6] *United States v. White*, 116 F.3d 903, 920 (D.C. Cir.) (per curiam) (citations omitted), *cert. denied*, 1997 U.S. LEXIS 6650 (U.S. Nov. 3, 1997), *cert. denied*, 1997 U.S. LEXIS 6660 (U.S. Nov. 3, 1997); *accord United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir. 1988).

a transcript of the recording, for use in aiding the jury, for an abuse of discretion. *See United States v. Wilson*, 578 F.2d 67, 69 (5th Cir. 1978).

B.

Tape recordings are admissible in a criminal trial if they are reliable. "The government has the duty of laying a foundation that the tape recordings accurately reproduce the conversations that took place, *i.e.*, that they are accurate, authentic, and trustworthy. Once this is done, the party challenging the recordings bears the burden of showing that they are inaccurate." *See United States v. Carbone*, 798 F.2d 21, 24 (1st Cir. 1986) (citation omitted).[7] We will reverse the admission of tapes on the ground that they are inaudible only if "the inaudible parts are so substantial as to make the rest more misleading than helpful." *Gorin v. United States*, 313 F.2d 641, 652 (1st Cir. 1963); *accord United States v. Nixon*, 777 F.2d 958, 973 (5th Cir. 1985).

Once recordings are admitted, the defendant can seek to impeach them by showing, for example, that the voice on the tape is not his; that the tapes do not recount the entire event; that they have been altered; or that they are untrustworthy or contradictory. The point is that the tapes themselves can be used to create a reasonable doubt in the jurors' minds.

---

[7] *Accord United States v. Polk*, 56 F.3d 613, 631-32 (5th Cir. 1995); *Lance*, 853 F.2d at 1181. Hearsay problems are not a concern if the jury believes that the defendant was one of the participants in the conversation; any statements he made would be admissible as a statement of a party opponent. *See* FED. R. EVID. 801(d)(2).

C.

1.

The government properly authenticated the tapes.[8]  At trial, FBI Agent Steger testified that he made the original recording of the conversation between Thompson and Gerber that took place on February 13, 1996.  He tested the recording equipment both before and after the tape was made, and it was operating properly.  He placed the recording device in the jail library and turned it on.  He also observed the conversation between Gerber and Thompson as it took place.  The tape began running before Gerber and Thompson arrived and continued to run after they left.

Steger made several trips, every few minutes, to check to see whether Gerber and Thompson were still talking.  The conversation lasted approximately forty-two minutes.  After Gerber and Thompson left the library, Steger retrieved the tape and turned it over to the FBI clerk responsible for maintaining evidence.

2.

The government then produced evidence to authenticate the enhanced tapes.  FBI Agent Gregory Major, a signal processing analyst, testified as an expert in the field of tape enhancement.  He stated that an enhanced tape is "an improvement in the intelligibility of the voice information over the original

---

[8]  "The Federal Rules of Evidence provide that the requirement of authentication 'is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims.'"  *Polk*, 56 F.3d at 631 (quoting FED. R. EVID. 901(a)).

7

recording through use of audio filters for purposes of playback before a jury or for transcription purposes." He testified that he made an enhanced recording of the recording made by Steger and explained in detail the procedure by which the tape recordings are enhanced. He also stated that the noises that were filtered out of the original recording were those from a public address system and occasional knocking against the microphone.

Major explained that in making the enhanced version of the recording, he did not add or delete any words. Gerber also testified that the enhanced tapes accurately reflected the conversation that took place between him and Thompson in the prison library.

### 3.

The government also presented Steger's testimony for purposes of authenticating the transcripts. He testified that he had prepared a transcript of the tape recording.[9] In preparing the transcription, Steger stated that he had listened to the tapes several times and that, as a result, he had updated his transcript repeatedly. Nothing indicates that Steger intentionally mis-transcribed the recorded conversation.

### 4.

Thompson challenged the admissibility of the tapes, arguing

---

[9] Steger also testified that he had prepared a second transcript with Gerber's aid. The court refused to admit this version, leaving the government to rely on Steger's first transcription.

that they were inaudible.[10]  The court conducted an *in camera* review of the recordings and overruled the objections, stating that "[d]efendant is correct that parts of the tape are unintelligible, but other parts, especially of the enhanced tapes, can be easily understood."

5.

Although we give deference to the district court's findings, we would reach the same result if we were reviewing the tapes *de novo*.  Although we acknowledge that the unenhanced tape is difficult to comprehend, the enhanced version is "easily understood."  It is possible to discern what was transpiring, even without a transcript.  The listener can hear Thompson talking about the money orders and about dumping Judge Hoyt in the ocean.  The district court properly admitted the enhanced tapes into evidence.[11]

6.

Thompson never offered his own transcription to rebut the accuracy of the government's, nor did he point to any inaccuracies in Steger's work.  Instead, he focused on the fact that Steger had to listen to the tape many times before he could make a complete transcription.  This objection, however, is directed at the

---

[10] The defense relied on a *res ipsa loquitur* argument in contesting the tape's unreliability.  It pointed the district court to no indicia of inaccuracy, but argued that listening to the tapes showed that they were unreliable and confusing for the jury.

[11] The court excluded the original tape.

9

reliability of the tape, not of the transcription.[12]

Moreover, the court instructed the jury that if it found any inconsistencies, the recording controlled; any conflicting part of the transcript was to be disregarded. The court did not abuse its discretion by admitting into evidence the enhanced tapes and the accompanying transcripts.

D.

Most of Thompson's arguments attack the weight the jury gave the tapes, rather than their admissibility. As noted above, Thompson was entitled to impeach the accuracy of the tape recording and the transcription in order to create reasonable doubt. Not only could he attack Gerber's credibilitySSand he didSSbut also he could have attacked the accuracy of the recording devices, of the enhancement process, and of the transcription procedure.[13] To the extent that he did so, the jury was entitled to credit the tapes and Gerber's testimony and to discredit Thompson's attempts at impeachment.

III.

Thompson claims that the district court violated his due

---

[12] The government proffered another version of the transcription that Gerber had helped to prepare. Thompson objected, and the court refused to admit the evidence. *See supra* note 9.

[13] The defense could have attempted to introduce the original tape in order to attack the reliability of the enhancement and transcription processes. It did not. Nor did it offer its own competing version of the transcription. Instead, it argued that both were *per se* unreliable.

process right to a fair trial when, during its introduction of the case to the jury, it referred to Thompson and Gerber as having established a friendship. "To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the function of the judge and prosecutor. The judge's intervention in the proceedings must be quantitatively and qualitatively substantial to meet this test." *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994) (citations omitted).[14]

Tellingly, Thompson offers no specifics of the alleged due process violation. That is because there was none. The government correctly notes that the court's comments, when read in context, are not error.

Here is the context: The court gave a brief summary of what each side was going to present. The court stated that "*the Government charges in this case* . . . that [Thompson] then struck up a friendship, acquaintanceship, call it what you will, with another inmate, the man that's called§§'Gerber' is his name." Thompson offers no evidence to show any bias by the court, nor does he rebut what appears to be a rational explanation for the court's comments, excerpted above, that Thompson claims are prejudicial.

---

[14] It is uncertain what standard of review should apply here. If the defendant fails to object at trial to the court's statements, plain error review attaches. *See United States v. Tolliver*, 61 F.3d 1189, 1208 (5th Cir. 1995), *vacated and remanded on other grounds*, 116 S. Ct. 900 (1996). Otherwise, a *de novo* standard would seem to apply. In this case, even if we assume that Thompson did object, his claims do not rise to the level of constitutional error.

Thompson's due process argument is meritless. There is no indication of error, let alone the pervasive error needed to establish a violation of a due process right to a fair trial.

IV.

A.

Thompson contends that the government committed a due process violation by failing to preserve and produce a copy of a second tape-recorded conversation between him and Gerber held a few days after the first. The government contends that the tapeSSwhich captured only an electronic noise because the recording equipment malfunctionedSSwas made available to the defense and was inspected by a defense expert.[15]

Thompson bears the burden of producing a sufficient record on appeal. *See United States v. Featherson*, 949 F.2d 770, 774 (5th Cir. 1991). Because he has failed to show any evidence that he did not in fact inspect and test the second tape, he has no error of which to complain.

B.

The government notes that Thompson's attorney may be confusing the failed tape in the second recorded conversation with a second tape that failed in the first recorded conversation. In the first

_____

[15] The docket sheet indicates that the court ordered the government to produce the equipment and tape from the second attempted recording. There are no further entries reflecting Thompson's attempts to enforce this order. Thus, either the government complied with the order, or Thompson failed to raise an objection to the government's failure to produce in accordance with the order.

12

recorded conversation—the subject of part II above—the government made two tapes:  one in a recorder in the library, and another in a transmitter also in the library.  The tape in the transmitter failed when the transmitter's signal could not penetrate the thick prison walls.  *See supra* note 2.  The tape in the recorder from the first conversation encountered no mechanical malfunctions, however, and was properly admitted.  *See supra* part II.  The tape from the transmitter was subsequently destroyed by the government.

For purposes of part IV.B, we will assume that Thompson is really arguing that the second tape from the first conversation—that is, the one in the transmitter—was destroyed, in violation of his due process rights.[16]  In order to establish a due process violation from the government's failure to preserve evidence, a defendant must show that (1) government officials acted in bad faith; (2) the evidence is material in showing the defendant's innocence; and (3) there is no alternate means of demonstrating the defendant's innocence.  *See Arizona v. Youngblood*, 488 U.S. 51, 56 (1988) (citing *California v. Trombetta*, 467 U.S. 479, 488-90 (1984)).

Thompson has offered no evidence that the second tape of the first conversation[17] was destroyed on account of any bad faith.  And

---

[16] Again, we are faced with a standard-of-review problem.  The error of which Thompson really claims is no error at all if he got what he wanted (the second tape) before trial.  The hypothetical error we will assume will also assume a hypothetical objection by Thompson.  These assumptions do not affect the outcome of our analysis.

[17] Even assuming that Thompson had shown that the FBI had destroyed the tape of the second conversation—the one that recorded only an electronic

(continued...)

he has pointed to nothing to demonstrate that the second tape of the first conversation captured exculpatory remarks that the first tape did not.[18]  The government committed no due process violation in this regard.

V.

Thompson challenges the tactics the government used when dealing with his witnesses, Lawrence Carlton and Paul Gardner.[19] Thompson alleges that at a bench conferenceSSoutside the jury's presenceSSthe government's attorney told defense *counsel* that counsel would suborn perjury if Carlton were to testify as planned.[20]  Thompson argues that the government interfered with Gardner's testimony when, during the FBI's initial investigation of the plot to kill Judge Hoyt, the agents informed Gardner and his wife of the consequences of not telling the truth.

---

(...continued)
noiseSSThompson failed to meet the *Youngblood* factors.  He demonstrated no malice for the tape's destruction.  He made no showingSSaside from his own allegationsSSthat the tape of the second conversation was exculpatory.  Finally, he failed to allege that there were no alternate means by which he could establish his innocence.

[18] The third factor is mooted if we find the information sought was not exculpatory.  But even if we were to find the evidence to be exculpatory, Thompson offered no evidence to show that he had no alternate means of demonstrating his innocence.

[19] Carlton was an inmate with Gerber and Thompson who testified about Gerber's bad reputation.  Gardner is Thompson's brother-in-law and testified about Thompson's good character.

[20] The government claims that, prior to testifying, Carlton indicated to the government that what he was going to say was false.  Thompson denies the allegation.

14

A.

"Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  To make a showing that the government has infringed on this right, the defendant must show that "the government's conduct interfered substantially with a witness's 'free and unhampered choice' to testify."[21]  "Because the existence of substantial interference is a factual question, we may reverse the trial court's decision only if it is clearly erroneous."  *Pinto*, 850 F.2d at 932 (quotation omitted).

B.

The government's conduct with respect to Carlton does not rise to the level of a constitutional violation.  The threats reached only the defense lawyer, and Thompson makes no allegation that the government ever told Carlton that if he testified, it would prosecute him for perjury.

In an adversarial system, a lawyer cannot be immune from warnings from his adversary.  There is no indication that the threat ever was transferred from the defense lawyer to the witness.  The threat, thus, could not have chilled Carlton's testimony.  At

---

[21] *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988) (quoting *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980)); *accord United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997).

the most, it prevented Thompson's lawyer from eliciting answers that he knew were false. Because the defense lawyer already had an ethical obligation to the court not to elicit such responses, Thompson has failed to establish any causal connection between the government's actions and the alleged rights violation.

Even if the government's warning to defense counsel constituted an interference with Thompson's right to call his own witnesses, it is hard to see how it rises to the level of a constitutional violation. The court sustained Thompson's objections to the government's warning, instructing both lawyers that the attorney would not be suborning perjury if Carlton were to testify. The conversation occurred outside the presence of the jury and of the witnesses. Accordingly, any fear defense counsel had when he proceeded to examine Carlton was not justified.

## C.

Thompson has failed to make the necessary showing that the government's actions "interfered substantially" with Gardner's "'free and unhampered choice' to testify." *Pinto*, 850 F.2d at 932 (quoting *Goodwin*, 625 F.2d at 703). The defendant bears the burden of showing that testimony would have been different *but for* the government's actions.[22] Thompson has made no such showing.

Thompson alleges that during one of the FBI's investigatory interviews of Gardner and his wife, the agents warned them that if

---

[22] *Cf. United States v. Hatch*, 926 F.2d 387, 395 (5th Cir. 1991) (holding defendant's evidence insufficient to prove that government's actions caused a defense witness not to testify).

16

they did not tell the truth, they could be arrested and jailed for perjury. Thompson claims that these statements prevented Gardner from giving all the testimony he otherwise would have provided.

The district court was correct to overrule any objections Thompson's lawyer made in this regard.[23] If anything, the record shows that Gardner was undeterred by the FBI's statements. At trial, he testified to the same account that he had provided the FBI investigators when the inquiry began.

Thompson's challenge is also flawed because it assumes that the government cannot tell a witness of the consequences of committing perjury. That is not the law. "Granted, the government told the witnesses that they had to testify truthfully and, if not, they would go to jail. That procedure, however, even if carried out in a caustic manner, is no cause to dismiss the indictment against the defendants." *United States v. Hayward*, 6 F.3d 1241, 1257 (7th Cir. 1993) (citation omitted). "There is nothing wrong with the government informing witnesses of the consequences of breaking the law."[24]

VI.

Thompson attacks the sufficiency of the evidence supporting

---

[23] The record does not indicate whether Thompson indeed objected. Nevertheless, for ease of explanation, we will assume that he did and thus that the clear error standard of review applies. This assumption does not affect the outcome of our analysis.

[24] *United States v. Hayward*, 772 F. Supp. 399, 406 (N.D. Ill. 1991), *aff'd*, *United States v. Hayward*, 6 F.3d 1241 (7th Cir. 1993); *accord United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988) (en banc) ("A prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct.").

17

his convictions. We will affirm if a reasonable trier of fact could conclude that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict. The evidence presented at trial need not exclude every reasonable possibility of innocence. *See United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir. 1994). The evidence more than supports the convictions on all three counts.

### A.

On the first count, under 18 U.S.C. § 1958, a reasonable jury could conclude beyond a reasonable doubt that Thompson (1) had caused another to use the mails (2) with intent that a murder be committed in violation of the laws of the United States (3) as consideration for the receipt of pecuniary value. The jury legitimately could credit Gerber's testimony and the tape recording and disregard Thompson's attacks on both. In both, Thompson states that he had his sister sendSSvia the mailsSSfour $500 money orders to a post office box. It is evident from his comments to Gerber that this money is a down payment on the murder of Judge HoytSSa federal judgeSSin violation of 18 U.S.C. § 1114.

### B.

On the second count, under 18 U.S.C. §§ 373 and 1114, a reasonable jury could conclude beyond a reasonable doubt that

18

Thompson had (1) solicited another (2) with intent (3) to kill a federal judge. The jury was entitled to credit Gerber's testimony and the tape recording and to discredit Thompson's attempts at impeachment. The evidence shows Thompson purposefully seeking Gerber out to have Gerber kill Judge Hoyt.

## C.

The evidence supports a conviction for the attempt charge under 18 U.S.C. § 1114. "The crime of attempt requires the Government to prove that the defendant (1) intended to commit the underlying offense, and (2) took a 'substantial step,' beyond mere preparation, toward committing that crime."[25] As noted above, a rational jury could credit Gerber's testimony and the tape recording to conclude, beyond a reasonable doubt, that Thompson intended to commit the underlying crime. *See supra* part VI.B.

Thompson argues that his actions did notSSas a matter of lawSSform a substantial enough step to constitute attempt. This objection is meritless. The agreement called for $2,000 down and $18,000 after the murder. Thompson sent the $2,000, then expressed his desire that the murder take place as soon as possible. According to Gerber, and on the tape, Thompson expressed neither interest in backing out of the deal nor regret. The deal required no more actions from Thompson in order for the murder to occur.

Thompson's actions were not mere preparation. He went to the

---

[25] *United States v. Polk*, 118 F.3d 286, 291 (5th Cir. 1997) (quoting *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974)).

19

very brink of carrying out his plan.  "Liability for attempt attaches if the defendant's actions have proceeded to the point where, if not interrupted, would culminate in the commission of the underlying crime."  *Polk*, 118 F.3d at 291.  A rational jury, therefore, could conclude beyond a reasonable doubt that Thompson's actions constituted an attempt on the life of Judge Hoyt.

## VII.

Thompson claims that the evidence is insufficient to support a jury finding that he had not been entrapped.  "When a jury, which was fully charged on entrapment, rejects the defendant's entrapment defense, the applicable standard of review is the same as that which applies to sufficiency of the evidence."  *United States v. Rodriguez*, 43 F.3d 117, 126 (5th Cir. 1995) (citation omitted).[26]

"Entrapment is an affirmative defense that requires a defendant to show he was induced to commit a criminal act by a government agent and that he was not predisposed to commit the act without the inducement."[27]  Once the defendant makes a *prima facie* showing on these two elementsSSno predisposition and governmental inducementSSthe court will give the entrapment instruction.  The government then bears the burden of showing beyond a reasonable

---

[26] The district court gave the jury the Fifth Circuit's pattern entrapment instruction.

[27] *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 197 (5th Cir. 1992); *accord United States v. Wolffs*, 594 F.2d 77, 80 (5th Cir. 1979).  A successful entrapment defense essentially negates the intent element of an intent-based crime, thus making conviction impossible.  Because we deal here only with an intent-based crime, we need not consider entrapment issues concerning non-intent-based crimes.

doubt that the defendant was not entrapped. *See United States v. Byrd*, 31 F.3d 1329, 1335 (5th Cir. 1994).

Because entrapment is the result of a jury finding of governmental inducement *and* no predisposition, *see Wolffs*, 594 F.2d at 80, a jury must necessarily find non-entrapment when the government proves beyond a reasonable doubt *either* the existence of predisposition *or* the non-existence of inducement.[28] "That the government bears the entire burden does not affect the fundamental truth that entrapment can be disproved in one of two ways, either by proving beyond a reasonable doubt that the defendant was not induced, or by proving beyond a reasonable doubt that he was predisposed to commit the crime." *El-Gawli*, 837 F.2d at 147.[29]

### A.

### 1.

On the first count, the evidence supports a finding of Thompson's predisposition. "The active, enthusiastic participation on the part of the defendant is enough to allow the jury to find predisposition." *Rodriguez*, 43 F.3d at 126-27.[30] A reasonable jury

---

[28] *See United States v. Cervante*, 958 F.2d 175, 178 (7th Cir. 1992); *United States v. El-Gawli*, 837 F.2d 142, 147 (3d Cir. 1988)

[29] Arguably, this court's pattern jury entrapment instruction misstates the law: "If, then, you should find beyond a reasonable doubt . . . the defendant was ready and willing to commit a crime . . . *and* that government officers . . . did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment." FIFTH CIR. PATTERN JURY INSTRUCTIONS § 1.28, at 40 (West 1997) (emphasis added). Given the components of the law of entrapment, *see Pruneda-Gonzalez*, 953 F.2d at 197, the instructions might more properly insert an "or" for the emphasized "and."

[30] In *United States v. Knox*, 112 F.3d 802, 808 (5th Cir. 1997), a panel
(continued...)

could conclude beyond a reasonable doubt that Thompson was predisposed (1) to use the mails (2) with intent that a murder be committed in violation of the laws of the United States (3) as consideration for the receipt of pecuniary value.

There is more than enough evidence to support the jury's finding of Thompson's predisposition with regard to the second two elements of the "use of the mails" count. The jury could credit Gerber's testimony and the tape recording (and the letters), and discredit Thompson's attacks on that evidence. Gerber's testimony and the tapes provide ample support for the inference that Thompson was ready and willing to pay someone to kill Judge Hoyt.[31]

The defendant's predisposition with regard to the first elementSSthe actual using of the mailsSSpresents a more complex question. Thompson did not think up the sending of money orders through the mails on his own. Rather, the government offered him that opportunity by giving him a post office box address, and he used it.

Although this question is somewhat closer, the evidence

---

(...continued)
held that "we must look not only to the defendant's mental state (his 'disposition'), but also to whether the defendant was able and likely, based on experience, training, and contacts, to actually commit the crime (his 'position')." This holding is arguably in tension with the rule we announced two years earlier in *Rodriguez*, stated in the text. The *Knox* predisposition holding has been vacated pending review by the en banc court. *See United States v. Knox*, 120 F.3d 42 (5th Cir. 1997); 5TH CIR. R. 41.3.

[31] A rational jury could have found beyond a reasonable doubt that Thompson intended to have Judge Hoyt killed. After all, the core theory of the defense was that Thompson had sent the $500 money orders to the post office box to commit another illegal actSSbribing a Supreme Court clerk. A jury could credit this willingness to commit a crime and discredit the defense's explanation of the crime that Thompson intended to commit.

supports a finding of predisposition on this element of the use-of-the-mails count. "Predisposition focuses on whether the defendant was . . . willing to commit the offense before first being approached by government agents." *United States v. Bradfield*, 113 F.3d 515, 522 (5th Cir. 1997) (emphasis omitted).

The stark facts of this case show that Thompson was fully in control of his options on how to proceed in the murder plot. When given a phone number to call, Thompson had refused. Instead, he intimated that he would prefer a more secure means to hire the hitmen. As a result, the government agents offeredSSand Thompson acceptedSSthe use of a post office box to which Thompson could send the money to have Judge Hoyt killed.

The defense never offered any countervailing evidence to raise a reasonable doubt that Thompson was not inclined to use the mails. Thus, the jury could find that Thompson was willing to use the mails before the government suggested it.[32]

2.

Even if the evidence failed to support a finding of predisposition on the first count, the jury's finding of no

---

[32] Even under *Knox*'s the "predisposition-plus" standard, Thompson loses in this case. A rational jury could conclude beyond a reasonable doubt that he had the experience and the contacts "to actually commit the crime." *Knox*, 112 F.3d at 808. Gerber testified, and Thompson stated on the tape, that Thompson had hired people before "to beat up bad people." Indeed, in this case, Thompson offers no evidence to show that he was not predisposed. Arguably, therefore, he was not even entitled to the entrapment instruction in the first place.

In any event, the government proved beyond a reasonable doubt that there was no governmental inducement. *See infra* part VII.A.2. That is enough to negate the entrapment defense. *See El-Gawli*, 837 F.2d at 147.

governmental inducement is supported by the evidence.  "Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime."  *See id.* (citation omitted).

The FBI's providing Thompson with a post office box does not amount to a "creative activity of law enforcement officials." Although the government's activity "need not overpower the defendant's will," *see id.*, it must at least "spur" him to commit a crime.

The government merely offered Thompson the opportunity to carry out his plan.  That the government gave him an avenue to commit an illegal actSSan avenue itself that happened to be illegalSSdoes not constitute inducement.  Instead, under these circumstances, the finding of inducement was a question of fact properly left for the jury.  Given the evidence presented, the finding of no inducement is supported by the evidence.[33]

B.

1.

The evidence also supports the finding of predisposition on the second and third counts.  The predisposition issue hereSSthat the evidence supports a jury finding that Thompson was already disposed to pay someone to kill Judge HoytSSwas addressed and

---

[33] Because the second and third elements of the first charge are similar to those forming the basis for the second and third charged counts, the jury's finding of no governmental inducement on those elements is discussed below in part VII.B.2.

discussed above.  *See supra* part VII.A.1 and note 31.

2.

A rational jury could also find beyond a reasonable doubt that the government did not induce Thompson to commit the actions charged in the second and third counts.[34]  The government's presentation of an opportunity for a defendant to commit a crime, without more, is not inducement.  *See Jacobson v. United States*, 503 U.S. 540, 550 (1992); *Bradfield*, 113 F.3d at 522.  The government gave Thompson the chance to carry out his plan to have Judge Hoyt killed.  Government agents arrived and arranged to have Gerber present Thompson with the opportunity to purchase a hit on Judge Hoyt only after Thompson had indicated a willingness to accept the deal.[35]  There is no credible evidence to suggest that government agents "spurred" Thompson to solicit and to attempt a murder of Judge Hoyt.  To the contrary, the record strongly supports an inference that Thompson, not governmental agents, was the motivating force behind the means, terms, and goal of the deal.

AFFIRMED.

---

[34] We also include in the discussion the second and third elements of the first charged count.  *See supra* note 33.

[35] Gerber testifiedSSand a reasonable jury could concludeSSthat Thompson had solicited Gerber in the murder-for-hire scheme before Gerber had notified the FBI and had become a government operative.

25