United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 10, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-20971

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

TERRY HIDALGO

Defendant - Appellant

--------------------
Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CR-455-16
--------------------

Before KING, WIENER, and OWEN, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Terry Hidalgo appeals his conviction of conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. For the following reasons, we AFFIRM his conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case stems from defendant-appellant Terry Hidalgo's involvement in a large methamphetamine trafficking organization which operated in Michiocan, Mexico; Harris County, Texas; and Montgomery County, Texas. Three sets of events are at issue in this appeal, and the government argues that the jury could have convicted Hidalgo of conspiracy based on any of these events.

---

[*] Pursuant to 5ᵀᴴ CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

The first set of events occurred in April 2004. At this point in time, Hidalgo owned two homes--one in Montgomery County, Texas, and the other in Lafayette, Louisiana--and traveled frequently between the two properties. Mark Wilburn testified at trial that in April 2004 he took Hidalgo, whom he had known for about four years, from Hidalgo's Montgomery County property to Hidalgo's home in Lafayette, Louisiana. Wilburn stated that during this trip, Hidalgo sold one ounce of methamphetamine and gave Wilburn $600 for the ride to Louisiana.

The second set of events occurred between May 23 and May 25, 2004. According to Wilburn's testimony, the following transactions occurred. Hidalgo told Christopher Savoy that Hidalgo could sell methamphetamine in Louisiana for $2000 an ounce, and Savoy then picked up some methamphetamine for Hidalgo to sell. Wilburn and Savoy drove to Hidalgo's house in Lafayette and delivered two ounces of methamphetamine to Hidalgo. Although Hidalgo did not pay for the methamphetamine up-front, he told Savoy that he could sell one ounce of the methamphetamine to an individual named Bill for $2000. Before returning to Texas, Wilburn and Savoy picked up the money Hidalgo owed them and a half-ounce of methamphetamine.[1]

The third set of events occurred in June and July 2004. In early June 2004, Savoy began providing information to the DEA on

---

[1] Hidalgo's version of the story differs from Wilburn's. Hidalgo testified that Wilburn attempted to front Hidalgo a large amount of methamphetamine, but that Hidalgo only took a small amount for his personal use. Hidalgo also testified that he refused to allow Wilburn to sell methamphetamine from his residence.

the drug organization's activities.[2]  Hidalgo and Savoy spoke on the telephone numerous times about the sale of Hidalgo's Montgomery County property.  Savoy, Bradford Crain, and Hidalgo met on June 16, 2004 to discuss the potential sale.  Hidalgo testified that he wanted to sell the property for cash, but the government alleges that the deal was for $171,000 worth of methamphetamine (about 114 ounces).  The government's witnesses testified that on June 16, 2004, Crain gave Hidalgo a down payment for the property in the form of two and one half ounces of methamphetamine.  Hidalgo testified that he never agreed to sell his house for drugs and that no payment was ever made.  Savoy wore a recording device to this meeting and the recording was admitted into evidence and played for the jury.  Among other things, the recording indicates that Hidalgo agreed to sell his home in exchange for drugs at this meeting.  Hidalgo also states that Savoy was armed during the meeting.

At trial, Hidalgo admitted that he signed the real estate agreement prepared during the meeting and that the purpose of the real estate agreement was to disguise the monthly methamphetamine payment by making it appear that $3000 was being paid monthly.  Evidence also showed that Savoy returned with several others to view Hidalgo's Montgomery County property on July 13, 2004.[3]

Hidalgo and fifteen co-defendants were charged in a

---

[2]  Savoy signed a DEA Confidential Source Agreement which expressly stated that Savoy was not a DEA or government employee and could not represent himself as one.

[3]  Dionisio Garcia, also known as Juan Martinez and Saul Martinez, was the head of the drug trafficking activity in Houston, Texas.

thirteen-count indictment.  The indictment charged Hidalgo in Count 1 with conspiracy to possess with intent to distribute fifty grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846 and in Counts 12 and 13 with conspiracy to commit money laundering and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i).  In response to Hidalgo's motion in limine, the district court ordered the government to approach the bench before referring to any criminal or drug trafficking organization.  Hidalgo asserted defenses of entrapment and public authority.

After the government rested its case during the jury trial, the court signed an order of acquittal as to Counts 12 and 13. Trial then continued as to Count 1.  The court did not instruct the jury as to the public authority defense, even though it had been requested by Hidalgo.  The court used the pattern jury instruction regarding entrapment.  The jury convicted Hidalgo of conspiracy to possess with intent to distribute methamphetamine, and the district court sentenced Hidalgo to 100 months' imprisonment and four years' supervised release.  The district court denied Hidalgo's motion for new trial.  Hidalgo now appeals.

## II. DISCUSSION

Hidalgo raises several challenges on appeal.  First, he argues that the evidence was insufficient to support his conviction.  Second, he contends that he was entrapped, and no evidence existed from which the jury could conclude that he was not.  Third, he urges that the pattern jury instruction on

entrapment misstates the law and should not have been used by the district court.  Fourth, he argues that the prosecutor committed reversible error by displaying a chart during the opening and closing arguments, and that as a result the district court should have granted his motion for new trial.  Fifth, he contends that the district court erred by not including a public authority defense in the jury charge, despite evidence at trial to support it.  Finally, he challenges the admission of a tape recording of the June 16th meeting into evidence.

## A.    Sufficiency of the Evidence

Because Hidalgo moved for judgment of acquittal at the close of the evidence, this court reviews a challenge to the sufficiency of the evidence by "'viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict' and determining whether 'a rational jury could have found the essential elements of the offenses beyond a reasonable doubt.'"  United States v. Valdez, 453 F.3d 252, 256 (5th Cir. 2006) (quoting United States v. Pruneda-Gonzalez, 953 F.2d 190, 193 (5th Cir. 1992)), cert. denied, 127 S. Ct. 456 (2006).  The jury alone weighs the evidence and makes credibility determinations.  United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995).  The evidence need not "exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt" so long as "a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt."  Pruneda-Gonzales, 953 F.2d at 193.  Nonetheless, this court "must reverse a conviction if the evidence construed in

favor of the verdict 'gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged.'" Jaramillo, 42 F.3d at 923 (quoting United States v. Menesses, 962 F.2d 420, 426 (5th Cir. 1992)).

In order to prove conspiracy to possess with intent to distribute methamphetamine, the government must prove beyond a reasonable doubt that: (1) the defendant and one or more persons agreed to violate the narcotics laws, (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy. United States v. Rosa-Fuentes, 970 F.2d 1379, 1381-82 (5th Cir. 1992). Evidence of an overt act is not required to prove a drug conspiracy. United States v. Ramirez-Velasquez, 322 F.3d 868, 880 (5th Cir. 2003). An agreement may be either explicit or implicit, and the fact finder may infer an agreement from "a concert of action." United States v. Mann, 161 F.3d 840, 847 (5th Cir. 1998). A fact finder can infer an agreement to join a conspiracy "from the performance of acts that further its purpose" even though not every act "that assists in the accomplishment of the objective of the conspiracy is a sufficient basis to demonstrate his concurrence in that agreement." United States v. Alvarez, 610 F.2d 1250, 1255 (5th Cir. 1980). An individual's "[m]ere presence at the scene of a crime or close association with a co-conspirator will not support an inference of participation in a conspiracy." United States v. Tenorio, 360 F.3d 491, 495 (5th Cir. 2004).

Hidalgo argues that while the evidence does show a large methamphetamine organization and conspiracy, the government

failed to present evidence from which the jury could conclude beyond a reasonable doubt that Hidalgo as an individual knew of or voluntarily participated in the conspiracy. Nonetheless, the evidence presented at trial is sufficient to support Hidalgo's conviction for conspiracy to possess with intent to distribute methamphetamine. The evidence presents multiple ways that Hidalgo could have committed conspiracy.

Based on the recording, the jury could have determined that the June 16th transaction evidenced a conspiracy offense because Hidalgo satisfied the agreement element when he agree to sell his Montgomery County residence in exchange for monthly methamphetamine payments. The jury could also have concluded that Hidalgo's statements during the meeting indicate both his knowledge of the conspiracy and that he was a willing participant. Other evidence at trial also supports this theory of conspiracy, including Crain's testimony that he gave Hidalgo two ounces of methamphetamine as a down payment. Hidalgo's intent to distribute the methamphetamine may be inferred because the down payment was a large amount of methamphetamine and the agreement required monthly payments of a large quantity of methamphetamine. See United States v. Moreno, 185 F.3d 465, 471 (5th Cir. 1999) (holding that intent to distribute narcotics may be inferred from a large quantity of narcotics or narcotics of particularly high value).

Additionally, the jury could have believed that Hidalgo joined the conspiracy prior to the June 16th meeting, during one of Wilburn's two trips to Louisiana. Testimony at trial stated

that during the first trip, Wilburn gave Hidalgo one ounce of methamphetamine which Hidalgo then sold, and that during the second trip, Wilburn and Savoy fronted Hidalgo two ounces of methamphetamine, which Hidalgo told Savoy that he would sell for $2000 an ounce.  Wilburn testified that he accompanied Hidalgo to sell part of the methamphetamine and that a day or two later Hidalgo paid Wilburn and Savoy for the fronted methamphetamine. The evidence thus shows that the arrangement between Hidalgo and Wilburn was a means of effectively distributing the drugs, not just a transaction between a buyer and seller.  See United States v. Townsend, 924 F.2d 1385, 1394 (7th Cir. 1991) (holding that although evidence of a buyer-seller relationship alone is not enough to support a conspiracy conviction, evidence of an agreement for something other than the exchange of drugs for money, such as to obtain drugs for distribution, can support a conspiracy conviction).

Hidalgo's lack of familiarity with some of the key members of the larger drug trafficking organization does not bar his conspiracy conviction.  A defendant does not need to personally know all of the members of a conspiracy.  See United States v. Garcia-Abrego, 141 F.3d 142, 155 (5th Cir. 1998) (holding that to be convicted of engaging in a criminal conspiracy, the defendant does not need to know the exact number or identity of all the co-conspirators).

Hidalgo also attacks the credibility of Wilburn's and Crain's testimony based on inconsistencies between their testimony and the transcript of the June 16, 2004, meeting, but

inconsistencies in testimony do not equate to insufficient evidence.  The uncorroborated testimony of a co-conspirator can be sufficient evidence to convict as "long as the testimony is not factually insubstantial or incredible."  United States v. Medina, 161 F.3d 867, 872-73 (5th Cir. 1998).  "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature."  See United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994).  The facts testified to by Crain and Wilburn could have been observed by them.  Thus, because Hidalgo has not shown Wilburn's or Crain's testimony to be incredible, the jury could choose to believe the testimony of either.  Id.

Finally, Hidalgo argues that he did not conspire with anyone because Savoy, as an informant, could not be a co-conspirator.  But the jury could have inferred from the evidence a conspiracy existed between Hidalgo and others, such as Wilburn.  See United States v. Manotas-Mejia, 824 F.2d 360, 365 (5th Cir. 1987) (holding that a conspiracy may exist among those individuals not acting as informants for the government, even though a government informant is involved in the plan).  The jury could also have inferred that a conspiracy formed between Hidalgo and Savoy before Savoy became a government informant.

B.    **Entrapment Defense**

At trial, Hidalgo asserted the defense of entrapment. Hidalgo claims that the evidence is insufficient to support a jury finding that he had not been entrapped.  "When a jury, which

was fully charged on entrapment, rejects the defendant's entrapment defense, the applicable standard of review is the same as that which applies to sufficiency of the evidence." United States v. Rodriquez, 43 F.3d 117, 126 (5th Cir. 1995). Thus, this court must view every fact in the light most favorable to the guilty verdict. United States v. Wise, 221 F.3d 140, 154 (5th Cir. 2000).

Entrapment is an affirmative defense, and to be successful, the defendant must establish (1) government inducement and (2) lack of predisposition to engage in criminal conduct. United States v. Thompson, 130 F.3d 676, 688 (5th Cir. 1997). Although Hidalgo maintains that the government entrapped him, a defendant's testimony generally does not establish entrapment "as a matter of law because, absent unusual circumstances, the jury is almost always entitled to disbelieve that testimony." Rodriquez, 43 F.3d at 127.

The jury could have inferred from the evidence an absence of government inducement.[4] The government may use undercover agents and informants to provide the avenue for the commission of an offense, Sorrells v. United States, 287 U.S. 435, 441 (1932), but the agents may not "implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." Jacobson v. United States, 503 U.S. 540, 548 (1992). A successful entrapment

---

[4] The parties disagree regarding whether Hidalgo waived the argument that the government induced him by not fully briefing the issue in his principal brief, but we need not reach this issue because we conclude that the jury could have inferred an absence of government inducement from the record.

defense requires that the government actually spur the individual to commit the crime.  See Thompson, 130 F.3d at 690.  If any inducement results solely from a private citizen, the entrapment defense does not apply.  United States v. Barnett, 197 F.3d 138, 143 (5th Cir. 1999).

The evidence provides many bases from which the jury could have inferred that no government inducement occurred.  First, as discussed above, the jury could have decided that Hidalgo joined the conspiracy during either of Wilburn's trips to Lafayette, both of which occurred before Savoy became a government informant in June.  The entrapment defense does not apply when the inducement originates from a private citizen, such as Wilburn. See id.  Even if the jury determined that Hidalgo joined the conspiracy at or near the time of the June 16th meeting, the jury may have determined that no entrapment occurred because the government did nothing more than present an opportunity for Hidalgo to commit the offense.  See Thompson, 130 F.3d at 690.

The jury could have determined that Hidalgo was predisposed to commit conspiracy to possess with intent to distribute methamphetamine from the testimony concerning his activities with Wilburn and the recording of the June 16th meeting, both of which show his knowledge and experience with drug activity and his willing participation.  This would render the entrapment defense inapplicable.  See United States v. Reyes, 239 F.3d 722, 739 (5th Cir. 2001) (holding that a defendant's ready and willing participation in the activity, desire for profit, knowledge or experience with a particular type of criminal activity, and past

criminal history may indicate a defendant's predisposition to commit the charged crime). Accordingly, the evidence is sufficient to support a jury finding that Hidalgo was not entrapped.

## C. Entrapment Instruction

Hidalgo argues that the pattern jury instruction used by this circuit for entrapment misstates the law because the language does not clearly express that the disposition to commit an offense must exist prior to the defendant's contact with the government. This court rejected that argument in United States v. Hernandez, 92 F.3d 309, 311 (5th Cir. 1996). Accordingly, Hidalgo's argument is foreclosed by circuit precedent. Hoque v. Johnson, 131 F.3d 466, 491 (5th Cir. 1997).

## D. Motion for New Trial

Hidalgo contends that the district court abused its discretion by denying his motion for new trial despite the prosecution's improper use of a chart reflecting the hierarchy of a criminal organization in the opening and closing arguments. The district court found any error from the display of the chart to be harmless because the complicated nature of the chart made it difficult to understand in the brief period of time it was displayed. The chart was not admitted into evidence, and the district court instructed the jury to consider only the evidence. Because the jury is presumed to follow its instructions, Richardson v. Marsh, 481 U.S. 200, 211 (1987), we hold the district court did not abuse its discretion in denying Hidalgo's motion for new trial. See also United States v. Akpan, 407 F.3d

360, 368 (5th Cir. 2005) (referring to the presumption that juries follow the instructions of the court).

## E.    Public Authority Defense

Hidalgo testified that during Savoy's May trip to Louisiana, Savoy showed Hidalgo a badge and police scanner and told Hidalgo that he was a task-force officer in a reverse sting.  Savoy was not a task-force officer, but Hidalgo argues that the evidence regarding Savoy's portrayal of law enforcement was sufficient to require the district court to include a public authority defense in the jury charge.  To avail himself of the public authority defense, Hidalgo had to show that a government official authorized him to engage in the defense.  See United States v. Spires, 79 F.3d 464, 466 n.2 (5th Cir. 1996).

This court cannot overturn a conviction "for failure to instruct the jury on a defense unless the requested but omitted instruction has an evidentiary basis in the record which would lead to an acquittal."  United States v. Spires, 79 F.3d 464, 466 (5th Cir. 1996).  We decline to consider whether an evidentiary basis for this defense existed as Hidalgo waived his right to the public authority instruction.  The trial transcripts reveal that Hidalgo's attorney agreed with the district court that the evidence did not present elements of the public authority defense.

## F.    Admission of Tape Recording

Hidalgo argues that the district court improperly admitted the tape recording of the June 16th meeting for two reasons: (1) the foundation was inadequate and (2) it violated the

Confrontation Clause.  We review the district court's evidentiary rulings for abuse of discretion, United States v. Cheramie, 51 F.3d 538, 540 (5th Cir. 1995), and alleged violations of the Confrontation Clause de novo, United States v. Delgado, 401 F.3d 290, 299 (5th Cir. 2005).

Tape recordings may be admitted into evidence if they are reliable.  See Thompson, 130 F.3d at 683.  To show reliability, the government must establish that (1) a competent individual operated the recording device, (2) the recording equipment was in sufficient working order, (3) there were no material deletions, additions, or alterations to the recording, and (4) the speakers could be identified.  United States v. Stone, 960 F.2d 426, 436 (5th Cir. 1992).  Yet, even if all these requirements have not been met, "the trial judge retains broad discretion to independently determine that the recording accurately reproduces the auditory experience."  Id. at 436.

All the prerequisites to admitting a recording have been established.  See Stone, 960 F.2d at 436.  The evidence indicates that the equipment was in sufficient working order when Savoy used it and that Agent Sowell, a competent individual experienced in the use of this type of equipment, operated it.  Despite Hidalgo's contention that Savoy altered the recording to manipulate the conversation, the recording device showed it operated without interruption during the time it was in Savoy's possession.  Further, the evidence indicated Savoy did not even know how to use the equipment.  Finally, the speakers in the recording could be identified.

Hidalgo's contention that the admission of the recording was error because portions of it were inaudible is also unfounded. Reversal of the admission of a recording due to inaudibility should occur only if "'the inaudible parts are so substantial as to make the rest more misleading than helpful.'" Thompson, 130 F.3d at 683 (quoting Gorin v. United States, 313 F.2d 641, 652 (1st Cir. 1963)). After a thorough review of the record, we conclude that the inaudible portions were not substantial and did not result in misleading the jury. Accordingly, the government satisfied the foundational requirements for admitting the tape.

The admission of testimonial hearsay is barred under the Confrontation Clause unless the witness "was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). The Confrontation Clause applies only to testimonial statements. Davis v. Washington, 126 S.Ct. 2266, 2274-75 (2006). A testimonial statement "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact'" and includes "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Crawford, 541 U.S. at 51-52.

The voices of Hidalgo, Crain, and Savoy can all be heard on the recording. Of those three individuals, only Savoy did not testify at trial and therefore was unavailable for cross-examination. Even if Savoy's statements are testimonial, they are not barred by the Confrontation Clause because they were

offered not for truth, but instead for context and evidence of knowledge. The Confrontation Clause does not bar testimonial statements when they are offered for some purpose other than the truth of the matter asserted. Id., 541 U.S. at 59 n.9; see also United States v. Acosta, 475 F.3d 677, 683 (5th Cir. 2007) (holding that the Confrontation Clause did not bar the use of a testimonial statement when it was offered to show that a witness's trial testimony was not a recent fabrication).

In Cheramie, this court held that an unavailable witness's recorded statements did not violate the Confrontation Clause because the statements were part of a reciprocal and integrated conversation between the informant and the defendant and necessary to provide a context for the defendant's statements. 51 F.3d at 541. Here, the jury needed to hear Savoy's statements to understand the meaning of Hidalgo's responses. Additionally, Savoy's statements within the conversation showed that Hidalgo had knowledge of the unlawful plan-that Crain would pay for the property with drugs, not money. Hidalgo's knowledge of the unlawful agreement is an element of the conspiracy offense. See Rosa-Fuentes, 970 F.2d at 1382. Because Savoy's statements were offered to establish context and Hidalgo's knowledge and intent to participate in the unlawful plan, rather than the truth of the matter asserted, the Confrontation Clause does not bar Savoy's statements. See Crawford, 541 U.S. at 59 n.9; see also Tennessee v. Street, 471 U.S. 409, 414 (1985).

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Hidalgo's conviction.