REVISED - JUNE 30, 1998

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 96-50352**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**DAVID BRACE,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court
for the Western District of Texas**

_____

June 24, 1998

Before POLITZ, Chief Judge, KING, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.[1]

RHESA HAWKINS BARKSDALE, Circuit Judge:

We granted rehearing en banc to consider whether, in order to rebut the entrapment defense raised by David Brace, the Government was required to prove "positional predisposition" on his part, a new requirement utilized in another circuit and by the panel; but,

_____

[1] Judge Jones concurs only in the result. Judge Smith joins in parts I, II.A.2, II.B., and II.C and concurs in the result.

we conclude that we cannot address that subissue because it was neither preserved in district court nor even raised, for the first time, on appeal. Instead, at issue is simply whether, under our existing precedent, Brace was entrapped as a matter of law.

A jury convicted Brace and Shannon Knox of money laundering. On appeal, the panel affirmed as to Knox; but, it reversed Brace's convictions, finding entrapment as a matter of law, because the Government failed to prove "positional predisposition" on the part of Brace. In taking this case en banc, we severed Knox, with the panel opinion as to him remaining unaffected; of course, as to Brace, we vacated that portion of the opinion as it related to him. *United States v. Knox*, 112 F.3d 802 (5th Cir.), *severed and granted rehearing en banc by* 120 F.3d 42 (5th Cir.), *cert. denied as to Knox*, ___ U.S. ___, 118 S. Ct. 616 (1997). Upon rehearing en banc as to Brace, we **AFFIRM**.

I.

Brace was the pastor of Faith Metro Church in Wichita, Kansas. In 1991, the church began construction on an 80,000 square foot building, financed through bonds, which required monthly payments of approximately $65,000. The church also owned and operated five, largely unprofitable, radio stations in the Wichita area, which had required an investment of approximately $500,000 over three years. In 1993, due to financial difficulties arising from these

2

obligations, the church issued bonds and sought short-term, unsecured loans.

Brace met in May 1994 with Mike Clark, a financial consultant from Houston, Texas, and Clark's assistant, Knox. During this meeting, Brace decided to pursue a limited private offering in the amount of $10.8 million to retire the church's outstanding debt. The church trustees approved the plan and the offering began in September 1994; but, there were few responses and no money was raised. Shortly after the offering began, Knox met Roy Clarkston, a financier, in October or November 1994; and Knox gave Clarkston a copy of the private offering prospectus. In February 1995, Clarkston told Knox that he knew of some "South American investors" who might be interested in Faith Metro Church.

Concerning those "investors", while Brace had been attempting unsuccessfully to secure financing for his church in Kansas, undercover federal agents were conducting a money laundering investigation in San Antonio, Texas. Beginning in October 1994, around the time that Knox first met with Clarkston, Drug Enforcement Administration Special Agent Gonzalez met several times with Clarkston, who was suspected of money laundering. Agent Gonzalez identified himself as a Columbian narcotics trafficker seeking to launder money from cocaine sales.

In early March 1995, Clarkston contacted United States Customs Special Agent Cisneros, who was operating undercover as the

3

"accountant" for Agent Gonzalez, and informed Agent Cisneros that he had a "major big time guy" from "a church group" who was "very interested" in talking to Cisneros and wanted to "close" the deal the following weekend. (During the investigation, conversations between the Agents and Brace, Knox, and Clarkston were recorded, by video and/or audio, with the exception of the two following 17 March meetings.)

On 17 March 1995, Agents Gonzalez and Cisneros met with Clarkston at a San Antonio hotel. Clarkston stated that he knew a minister who was interested in laundering the cocaine money, and that the minister's financial advisor was in town and eager to meet with them. At this time, the Agents had no knowledge of the identity of either Brace or Knox. Agent Gonzalez told Clarkston that he did not want any innocent people involved in the operation and asked if the minister (Brace) knew Gonzalez was a cocaine trafficker looking to launder cocaine proceeds. Clarkston stated that the minister and his financial advisor knew and did not care.

That same afternoon, Clarkston brought Knox to the hotel to meet the Agents. Knox told them that he was the representative for the minister and wanted to negotiate a deal. The Agents told Knox, early in the conversation, that Agent Gonzalez was a Colombian drug trafficker; that Agent Cisneros was the accountant for the drug organization; and that the deal involved laundering money from

4

cocaine sales. Knox responded that he and the minister knew this and were not concerned about the money's source.

Knox explained that Brace's nonprofit Kansas corporation, New Life Fellowship, Inc., d/b/a Faith Metro Church, could launder the money; and, that the transaction would not arouse suspicion, because a minister was involved. Knox provided a copy of the private offering prospectus for Faith Metro Church. Agent Gonzalez told Knox that the Agents needed to meet with Brace to ensure that he understood that they were drug traffickers seeking to launder cocaine proceeds. Knox stated that Brace would gladly meet with them and could do so within 12 hours.

Over the next few days, Clarkston left telephone messages with Agent Cisneros that Knox and Brace were in San Antonio and ready to meet with the undercover Agents. On 24 March 1995, Agents Gonzalez and Cisneros met Brace, along with Clarkston and Knox, in a San Antonio hotel room. Gonzalez stated that he was authorized to "invest" up to $10 million, but that Knox and Brace would first need to transfer some test amounts, around $100,000.

Brace quickly agreed, assuring that he would do whatever was necessary in order to accomplish his goal and satisfy Gonzalez's organization. The Agents then stated that they needed to "go into the delicate issues", so that "there [were] no misunderstandings" or "confusion as to where the money [was] coming from". During the meeting, Agent Cisneros stated: "[Agent Gonzalez] plainly puts it

5

... that the money is from the sale of cocaine trafficking. That it is narcotics money. ... he is asking you to launder money".

Brace responded: "I have monies that I know that come to the church. I don't have a questionnaire ... where these monies come from." Brace told the Agent that he knew that he had received funds "from sources that, uh, would be questionable". Brace then stated: "I prayed to God ... because I wanted to know if I was supposed to do this". According to Brace, "God said that ... He helped put this []together." Finally, Brace told the Agents: "I appreciate the fact that you want to be very straight forward and up front with me. ... but, uh, that does not concern me, really."

Brace and Knox stated that they were surprised, however, by the $10 million figure, because they had originally been seeking only $3 million. Brace and Knox stated that they would need some time to figure out how long it would take to transfer and repay this larger amount. Agent Gonzalez explained that he would give various denominations of cash to Knox and Brace; and they responded that they had already discussed those matters, although the Agents had never before met with Brace. Gonzalez agreed to pay Brace, Knox, and Clarkston six percent of the transferred amount. Brace assured the Agents that he was ready to transfer the test money, but Agent Gonzalez told him to have patience and wait.

A month later, on 24 April 1995, Knox telephoned Agent Cisneros, informing him that Brace was in San Antonio and ready to

take the first test money.  Knox stated also that he and Brace had already "contrived a system" to quickly deposit and transfer the first $100,000.

Two days later, Agent Cisneros met with Brace and Clarkston in San Antonio.  At the beginning of the meeting, Agent Cisneros told Brace that the Colombian organization had just "crossed" three tons of cocaine into the United States, and explained, "[s]o ... now there's a lot of profit".  Agent Cisneros gave Brace the account number for an undercover account in a London bank.  Brace stated he would wire the $100,000 from his Wichita bank, but suggested transferring the money instead to a domestic bank, because it would clear faster and because Faith Metro Church had not previously transferred money to a foreign bank.  Agent Cisneros told Brace that "the Colombians" probably would not change the destination account; but, that all other details of the transaction were left to Brace.

Brace also discussed how the $10 million would be repaid: he planned to make payments of $50,000 per month for the first two years; of $100,000 per month for the next two years; and then pay the balance.  During this meeting, undercover Agents Gallman and Pineda gave $100,000 to Brace.  Agent Cisneros offered Brace two opportunities to withdraw from the transaction, but Brace declined both times.

7

Brace enlisted Mark Raccuglia, a staff member at Faith Metro Church, to help launder the money, giving him specific instructions to obtain cashier's checks with different remitters from certain banks and to deposit them in specific accounts. And, Brace instructed Raccuglia to use cashier's checks in amounts less than $3000 each, in order to avoid the internal records policy at the banks.

Brace successfully transferred this first test amount to the London account, and told Cisneros that he was ready to transfer the next test amount. Knox telephoned Agent Cisneros on 3 May and told him that Brace received $3000 as his share for the first test transfer.

Two days later, on 5 May, Agents Cisneros and Gallman met with Brace in San Antonio to discuss the second test transfer. Brace was told to make a transfer to a domestic account, ostensibly Agent Gallman's. Brace said that there were no difficulties running funds through his church's accounts, because they were listed as offerings or donations. Brace also suggested that, to avoid suspicion, they not transfer the same amount again.

Brace told Agent Gallman that he would account for the money transfers in installments, carried on his books as a loan, and would assimilate it over time through church offerings. And, Brace explained that, because Faith Metro Church was a 501(c)(3) corporation, the books were not public records. Brace informed the

8

Agents that he would explain the next test transfer as an advance payment on interest for the large loan he would soon be receiving. Brace indicated that his involvement in this operation was "supposed to happen" and that

> the fact is that I'm not ... getting a whole lot of ... respect. ... I almost have to go to [] bankers and [] show them that ... I do not need the money in order for them to loan it to me. And then [], frankly [], ... I'm just tired of being somebody's whipping dog.

After receiving the second $100,000 test amount, Brace commented to the Agents, "I have a feeling that neither one of you, have ever come across a pastor like me". Brace confirmed that he would again receive $3000 as his commission. (Brace apparently had excluded Clarkston from this meeting because of potential disagreement over how to split the six percent commission.)

When Brace returned to Kansas with the second $100,000, he directed Raccuglia to research cash reporting requirements. Raccuglia told Brace that his research indicated that Brace was money laundering, but Brace assured him this was not true. Brace, again with Raccuglia's assistance, successfully transferred the money from the church's Wichita bank; this time, to a domestic bank.

After the second test transfer, Knox told Agent Cisneros that Brace had 11 accounts set up through which he could move $4 million in 30 days. Knox said that Brace was willing to make another test transfer and that "ten million dollars is just the tip of the

9

iceberg that we can put through [Faith Metro Church]. It's turning into a washing machine real fast". In a subsequent telephone conversation between Agent Cisneros and Brace, Brace reiterated Knox's information about the 11 accounts and said that he had acquired a large safe in which to store the money.

On 12 May, Agent Cisneros met with Brace, Knox, and Clarkston and delivered the last test amount, this time for $150,000. Agent Cisneros stated that "the Colombians" would soon start with $5 million of the "big money", which would include a bonus for Brace. Brace responded that he had someone researching "what raises eyebrows overseas", and that he could transfer the test amount using accounts at three separate banks. Agent Cisneros emphasized that the Colombians were dangerous dope dealers.

Brace and Knox successfully transferred the third test amount. Brace told Raccuglia that Knox handled the transfer, because Brace "wanted [Knox] to be as involved in it as he was".

On 18 May, Knox telephoned Agent Cisneros and told him that he and Brace were in San Antonio and ready to do the big deal (even though no arrangements had been made by Agent Cisneros for it to happen then). Brace telephoned Agent Cisneros later and apologized for appearing too anxious. Agent Cisneros testified that he delayed further action, repeatedly emphasizing that the Colombians were ruthless drug dealers, so that Brace and Knox would have an opportunity to "cool down" and withdraw. During this "cool down"

10

period, Brace repeatedly tried to contact Agent Cisneros by telephone.

On 16 June, Agent Cisneros had a telephone conversation with Brace and Knox. Knox said that he and Brace, after working together for 48 hours, had the necessary equipment to transfer the money. Brace added that he had several suitcases of different sizes and asked how the money was packaged. Agent Cisneros responded that the Colombians were thinking about waiting awhile, to which Brace replied:

> I'm not goin' anyplace.
>
> ....
>
> Uh, I'm not ancy. Uh, you know, I'm ready just like you to finish it. Uh, I've got my things in place at home. Uh, I'm prepared. Uh, in fact, I'm [] probably over-conservative and over-killed at home as far as protection and as far as, uh, making sure of safety and [] moving things....

On 21 June, Brace and Knox met with undercover Agents in a parking lot in San Antonio and accepted three canvas bags filled with paper clippings approximating the weight of $10 million in cash. Brace and Knox left the parking lot in Brace's car with the bags, intending to drive to Kansas, but were arrested immediately. The arresting Agents found a .380 caliber semi-automatic pistol in the back seat of Brace's car, along with a fully-loaded clip of ammunition. Brace had bought the pistol the day before his arrest,

because he thought that "the Colombians" expected him to protect the money.

Brace and Knox signed written statements admitting to their involvement in the money laundering.  Each was charged with one count of conspiring to launder money and one count of laundering money; Brace, also on two other money laundering counts. Clarkston was also indicted; he pleaded guilty.

In December 1995, Brace and Knox were tried jointly; their sole defense was entrapment.  A jury convicted them on all counts, and Brace was sentenced to 175 months imprisonment and fined $10,000.

Knox's convictions and sentence were affirmed by a panel of our court, *Knox*, 112 F.3d at 810-14; but, it reversed Brace's convictions, holding that, because the Government failed to prove the element of "positional predisposition" beyond a reasonable doubt, Brace was entrapped as a matter of law.  *Id*. at 806-10. Subsequently, our court severed the affirmance with respect to Knox; but, as for Brace, we vacated that portion of the panel opinion pertaining to his convictions and granted rehearing en banc.  *Knox,* 120 F.3d at 43.

## II.

The issues presented by Brace on appeal are that the district court committed reversible error: (1) by failing to hold he was entrapped as a matter of law; (2) by using our pattern jury

12

instruction on entrapment; and (3) by incorrectly calculating his sentence. Our reason for rehearing was to address, concerning the entrapment issue raised by Brace, the panel's adoption of a new "positional predisposition" requirement.

A.

The Supreme Court first recognized the entrapment defense in *Sorrells v. United States*, 287 U.S. 435 (1932). It described entrapment as "when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person *the disposition* to commit the alleged offense and induce its commission in order that they may prosecute". *Id.* at 442 (emphasis added).

> [T]he defense of entrapment is not simply that the particular act was committed at the instance of government officials. ... *The predisposition and criminal design of the defendant are relevant*. But the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials.

*Id.* at 451 (emphasis added).

The Court found entrapment as a matter of law in *Sherman v. United States*, 356 U.S. 369 (1958), when a drug addict repeatedly rejected offers from an undercover officer to buy drugs, including appeals of sympathy for the undercover officer's needs and inducements for the addict to return to his drug habit. "To

13

determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal". *Id.* at 372.

In performing this determination, the Court instructed that the defendant should be subjected to "an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence". *Id.* at 373 (quoting **Sorrels**, 287 U.S. at 451). Therefore, **Sherman** focused on the accused, not the undercover officer, and found that he was not predisposed because, *inter alia*, there was a lack of evidence that he was currently in the drug trade, no drugs were found in his residence, he did not appear to make a profit on the sales, and he was trying to overcome his drug habit. *Id.* at 375-76.

**United States v. Russell**, 411 U.S. 423 (1973), relying on **Sorrells** and **Sherman**, keyed on the *defendant's subjective intent*, rather than the *undercover officer's objective conduct*: "It is *only* when the Government's deception *actually implants the criminal design* in the mind of the defendant that the defense of entrapment comes into play". *Id.* at 436 (emphasis added). This test would negate an entrapment defense for defendants who are ready to commit a crime, even though they were subjected to inducements that "might have seduced a hypothetical individual who was not so predisposed". *Id.* at 434.

14

In ***Hampton v. United States***, 425 U.S. 484 (1976), the Court revisited this subjective predisposition standard, holding that "***Russell*** definitively construed the defense of entrapment to be focused on the question of predisposition". ***Id.*** at 492 n.2 (Powell, J., concurring). However, only a plurality of the Court agreed that ***Russell*** stood for the proposition that, when the defendant's predisposition is proven, an entrapment defense can never be established solely on governmental misconduct. ***Id.*** at 488-89.

***Mathews v. United States***, 485 U.S. 58 (1988), synthesized Court precedent on the entrapment defense:

> [A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct. ... Predisposition, "the principal element in the defense of entrapment," ... focuses upon whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.

***Id***. at 63 (citations omitted).

In 1984, based upon the foregoing entrapment precedent, our court reaffirmed the key components of the defense:

> Consistent with this summary of Supreme Court directives, our inquiry always has been on the defendant's predisposition, *his intent or willingness--before contact with government agents and inducement--*to commit the crimes charged. ... The concern is thus that the accused is not guilty, *since he had no criminal intent not implanted by the*

15

*government*, rather than that he is guilty but may avoid the consequences of his criminal conduct because of the government's undue inducement.

*United States v. Henry*, 749 F.2d 203, 210 (5th Cir. 1984) (en banc) (emphasis added).

Almost eight years later, however, in *Jacobson v. United States*, 503 U.S. 540 (1992), the Court held that a defendant was entrapped as a matter of law when officers made repeated attempts, for two-and-a-half years, to induce him to purchase child pornography through the mails. Due to the Government's relentless conduct, which included urging the defendant to take a stand against censorship and for freedom of expression, the Court held that rational jurors could not find, beyond a reasonable doubt, "*that petitioner possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches to petitioner*". *Id.* at 553 (emphasis added).

For our purposes here, one post-*Jacobson* case, from another circuit, also comes into play: *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994) (en banc). It interpreted *Jacobson* to require evidence that the defendant was "so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the Government had not induced him to commit the crime some criminal would have done so".

16

> Predisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has *positional* as well as dispositional force. ... A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed. It is different when the defendant is not in a position without the government's help to become involved in illegal activity. ... Such cases, illustrated by **Jacobson**[,] ... are rare.

*Id.* The Seventh Circuit found that the defendants, a farmer and an orthodontist, were "objectively harmless", because "[n]o real criminal would do business with such [novices]". *Id.* at 1202-03. *But see* **United States v. Thickstun**, 110 F.3d 1394, 1397-98 (9th Cir.) (rejecting the **Hollingsworth** "positional predisposition" standard), *cert. denied*, ___ U.S. ___, 118 S. Ct. 305 (1997).

### 1.

Brace claims that he was entrapped as a matter of law. The Government acknowledges that it induced him to launder money. Therefore, at issue is whether the evidence was sufficient to prove, beyond a reasonable doubt, that he was predisposed to do so. For deciding that issue, we must first examine subissues raised by the parties. But, in so doing, we have discovered that, as sometimes happens when we take a case en banc, this is an instance in which the reason for rehearing evaporated, because a "positional

17

predisposition" subissue was neither preserved in district court nor even presented, for the first time on appeal, to the panel.

It goes without saying that we are a court of review, not of original error. Restated, we review only those issues presented to us; we do not craft new issues or otherwise search for them in the record. *E.g.*, **United States v. Johnson**, 718 F.2d 1317, 1325 n.23 (5th Cir. 1983) (en banc) (we will not review improper jury instruction if neither raised in trial court nor claimed on appeal to be error). It is for the parties, those who have a stake in the litigation, to decide which issues they want to pursue, at trial and on appeal. Diverse reasons underlie the choices the parties make. Likewise, other obvious factors come into play, such as judicial efficiency and economy, fairness to the courts and the parties, and the public interest in litigation coming to an end after the parties have had their fair day in court. *Cf*. **United States v. Atkinson**, 297 U.S. 157, 159 (1936); **United States v. Olano**, 507 U.S. 725, 731 (1993); **United States v. Calverley**, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1196 (1995). In short, it is not for us to decide which issues should be presented, or to otherwise try the case for the parties.

Our role is indeed limited. Concerning our not acting as legislators, Justice Cardozo admonished that a judge "is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness". CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 141

18

(1921). Needless to say, the same is true regarding our not addressing issues not presented to us.

In holding that Brace was entrapped as a matter of law, the now-vacated Brace-portion of the panel opinion adopted the above-discussed "positional predisposition" requirement espoused by the en banc Seventh Circuit in **Hollingsworth**. **Knox**, 112 F.3d at 808 (vacated) (holding that "we must look not only to the defendant's mental state (his 'disposition'), but also to whether the defendant was *able and likely, based on experience, training, and contacts,* to actually commit the crime (*his 'position'*)") (emphasis added).

Notwithstanding the panel's fidelity, the problem is that, as discussed *infra*, this "positional predisposition" subissue or element was not presented by Brace either to the district court or on appeal. And, as noted, our en banc reconsideration vacates the panel opinion as to Brace. **Knox**, 120 F.3d at 42; 5th Cir. R. 41.3; *see, e.g.,* **Leffall v. Dallas Indep. Sch. Dist.**, 28 F.3d 521, 529 n.2 (5th Cir. 1994). In short, the new "positional predisposition" requirement adopted by the now-vacated Brace-portion of the panel opinion is no more. The reasons why this requirement or element is not at issue follow.

Our court held, just eight months after Brace's December 1995 trial, that our pattern jury instruction on entrapment, quoted below, reflects the holding in **Jacobson,** decided in 1992. **United States v. Hernandez**, 92 F.3d 309, 311 (5th Cir. 1996), *cert.*

19

*denied*, ___ U.S. ___, 117 S. Ct. 1437 (1997).  In fact, in the case

at hand, the panel rejected a challenge by Knox to the instruction,

citing ***Hernandez***, without further discussion.  ***Knox***, 112 F.3d at

810 (non-vacated portion).

At trial, Brace did not object to Fifth Circuit Pattern Jury

Instruction No. 1.28.  It provides in relevant part:

> The defendant asserts that he was a victim of entrapment.
>
> Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and the law as a matter of policy forbids that person's conviction in such a case.
>
> On the other hand, where a person already has the *readiness and willingness* to break the law, and the mere fact that government agents provide what appears to be a favorable opportunity is not entrapment.  For example, it is not entrapment for a government agent to pretend to be someone else and to offer ... to engage in an unlawful transaction.
>
> If, then, you should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, the defendant was *ready and willing* to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that government officers ... did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment.
>
> On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the *previous intent or purpose* to commit an offense of the

20

character charged, apart from the inducement or persuasion of some officer ... of the government, then it is your duty to find the defendant not guilty.

The burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped.

(Emphasis added.) As stated, this instruction is a correct statement of the holding in *Jacobson*.

Brace's supplemental (en banc) brief, in responding to our en banc court's expressed interest in the parties addressing "positional predisposition", urges, for the first time, that the "positional predisposition" element is embodied in this pattern instruction. Specifically, he maintains that the terms "ready" and "readiness", as used in the instruction, equate with the "ability" to commit a crime. (Presumably, this tardy contention is offered to explain Brace's failure at trial to object to the entrapment instruction. If so, this, of course, is most inconsistent, as he acknowledges, with his similarly belated challenge on appeal to the pattern instruction, discussed *infra*, which he concedes is reviewed only for plain error in the light of his failure to object at trial to the instruction. This tactic is not simply "alternative claims"; Brace, instead, "wants to have his cake and eat it too".)

The now-vacated Brace-portion of the panel opinion also looked to "ability": "A defendant may have the desire to commit the crime, but may be without any *ability* to do so. The defendant is *able* to commit the crime only when the government steps in and provides the

21

means to do so". **Knox**, 112 F.3d at 807 (vacated) (emphasis added). But, "ready and willing" is not necessarily synonymous with "ready, willing, *and able*". *Cf*. **Hendershot v. Amarillo Nat'l Bank**, 476 S.W.2d 919, (Tex. Civ. App.--Amarillo 1972, no writ) (denying specific performance of a contract, which requires the party seeking performance to prove he is "ready, willing *and able*" to perform, because "appellant failed to establish the *essential element of his ability* to perform") (emphasis added). (In addition, the contention that the evidence fails to show that Brace was *able* to commit the charged offenses is a dubious one. As detailed *infra*, the successful completion of three test transfers to bank accounts, both foreign and domestic, among other evidence of Brace's role in the money-laundering operation, appears sufficient for the jury to find, beyond a reasonable doubt, that Brace was more than "able" to money launder.)

In any event, it goes without saying that, when entrapment is raised against a charged offense, the Government bears the burden of demonstrating, beyond a reasonable doubt, that the defendant was predisposed. *E.g.*, **United States v. Byrd**, 31 F.3d 1329, 1335 (5th Cir. 1994), *cert. denied*, 514 U.S. 1052 (1995). On the other hand, the absence of entrapment is not an essential element of a charged offense; instead, entrapment is an affirmative defense. *See* **United States v. Elorduy**, 612 F.2d 986, 990 (5th Cir.), *cert. denied*, 447

22

U.S. 910 (1980). And, predisposition is generally a question of fact for the jury. *Sherman*, 356 U.S. at 377.

It follows that, when entrapment is claimed, the Government should not be required to meet its predisposition burden by providing evidence to the jury on an unlimited number of possible entrapment theories or elements, such as "positional predisposition", never raised or mentioned by the defendant by motion, objection, or countervailing evidence. *Cf.* *United States v. Valencia*, 645 F.2d 1158, 1176 (2d Cir.) (Van Graafeiland, J., concurring in part and dissenting in part) (stating that a defendant should not be allowed to deny commission of a crime and then, at the close of all the evidence, ask for an entrapment jury charge, because "[d]efense counsel should not be allowed to maneuver the Government out of introducing whatever proof it has on the issue of defendant's predisposition"), *amended by* 669 F.2d 37 (2d Cir. 1980). Therefore, it is unknown whether, at trial, the Government would have introduced or emphasized certain evidence relating to Brace's *ability* to money launder, if it had been placed on notice in district court that *ability* was at issue. But, again, it was not placed on such notice.[2]

---

[2]     The dissent maintains that we should consider the positional predisposition subissue or element, even though the parties have failed or chosen not to do so, on the basis that legal analysis is an inherent function of an appellate court. This sweeping statement need not be addressed, because the "positional" subissue (*i.e.,* that Brace did not have the ability to carry the underlying act to fruition) involves both *factual* and *legal*

23

In district court, in addition to not objecting to the entrapment instruction, as discussed *supra*, Brace did not otherwise mention "positional predisposition", or a similar concept. In fact, **Hollingsworth** and **Jacobson**, relied upon heavily in the now-vacated Brace-portion of the panel opinion and decided long before Brace's trial, were not even cited by Brace at trial or sentencing.

During opening statements and closing arguments at trial, Brace's counsel urged that Brace was entrapped, but did not assert "positional predisposition", or otherwise claim that Brace was *unable* to money-launder. During his opening statement, which covered 17 pages of transcript, Brace's counsel made the following comments that only hinted, at best, that the "positional predisposition" concept would be urged at trial:

> Roy Clarkston ... was really a money launderer in the true sense.
>
> ....
>
> [The Government] got [Brace] to launder one hundred thousand dollars, and to do as they

---

components. As noted above, due to Brace's not raising the issue of positional predisposition, the Government and the district court were never on notice that Brace's *ability* to commit the crime was at issue, *legally* or *factually*.

Along this same line, we need not address the dissent's statement that, in criminal trials, sufficiency-of-the-evidence issues may be preserved with general objections. Instead, as noted *supra*, Brace's sufficiency-of-the-evidence issue *was preserved* by his general motions for judgment of acquittal; it is the factual and legal subissue of whether Brace was in the position to commit the crime that was never raised, and, hence not preserved.

> told him to do by sending that money to their account wherever.
>
> ....
>
> Roy Clarkston ... was sending letters and telling [Brace] how this would be done, and we're going to show you those letters that Roy Clarkston created to give him the opportunity to go to his bankers, and perpetrate the transactions that were necessary to do this.
>
> ....
>
> [W]e're going to show you the simple, almost simpleton manner in which [Brace] was talking to these people about [how] he had to learn these things, and you know, he'd learn them and he'd learn them and he'd learn them. And he'd do it, and he could do it, and he felt that he could do it through his church and so forth.
>
> ....
>
> [Brace] was lying to them about his ability to do what they wanted him to do....

Likewise, during closing argument, spanning 22 pages of transcript, Brace's counsel made only the following remarks suggesting a "positional predisposition" element:

> [Y]ou talk about a virgin? [Brace] goes out and sends his assistant to the library, of all places, to find out about money laundering so that he could do it as effectively as possible so that he could please them. And he did, and he laundered.
>
> ....
>
> God knows we have enough dope peddlers and pushers and money launderers who are legitimately so.

25

More importantly, during the motions for judgment of acquittal, at the close both of the Government's case-in-chief and of all the evidence, neither counsel for Brace nor for Knox presented "positional predisposition" contentions, or otherwise put the Government on notice that this new element was being relied upon. At the close of the Government's case-in-chief, defense counsel stated:

> **COUNSEL FOR KNOX**: ... I move for a directed verdict of acquittal on behalf of defendant Shannon Knox. I think what the evidence has shown is entrapment as a matter of law. *There is no evidence to predisposition*, and there's plenty of evidence of inducement. This is entrapment as a matter of law. So we move for a directed verdict of acquittal at this time.
>
> **COUNSEL FOR BRACE**: Yo Tambien [me also].

(Emphasis added.) And, at the close of all the evidence:

> **COUNSEL FOR KNOX**: Your Honor, while we're outside the [presence] of the jury I'd like to renew my motion for a directed verdict.
>
> **COURT**: Okay. And [counsel for Brace], [do] you join in that motion on behalf of your client?
>
> **COUNSEL FOR BRACE**: I do.

*Jacobson* was not cited by Knox until his motion for release pending appeal. And, in seeking a downward departure at sentencing, counsel for Knox referenced the

> propensity to commit a crime, not necessarily the gumption or ability, aside from being presented the opportunity.... In real life, how likely would it be for [Knox and Brace] to run into real Colombian drug lords? It's

26

> pretty slim....  These aren't the kind of people real drug lords employ.  They didn't have the ability, they didn't have the criminal make-up.

This statement was made by counsel for Knox, *not* Brace.  In any event, this sentencing hearing statement, which was obviously not presented prior to the jury's verdict, did not present the district court with the question of whether "positional predisposition" is an element of, or subissue for, Brace's entrapment defense, on which the Government would have the burden of proof.

Notwithstanding these comments by Knox's counsel at sentencing, Brace's brief on appeal (considered by the panel) did not mention "positional predisposition".  That brief lists the entrapment issue merely as: "Whether Brace was entrapped as a matter of law by the undercover government agents".  Fourteen pages into his 15-page section on "entrapment as a matter of law", Brace finally included the following language:

> Clearly, Brace and Knox were not capable of designing, funding and completing a money laundering scheme on their own, without the government's substantial assistance and inducement.  As evidenced by their statements and actions during the course of the investigation, they were indeed "virgins" and "wannabe" money launderers, not the real thing. *[S]ee **United States v. Hollingsworth***, 27 F.3d 1196, 1202 (7th Cir. 1994) (real money launderers or drug dealers would never have dealt with or relied on such clear novices.) As in **Hollingsworth**, Brace and Knox had no prayer of becoming money launderers without the government's help in supplying the contacts, the money and the know-how.  "Anyone can wire transfer money, but to get into the

27

> international money laundering business you need underworld contacts, ... financial assets or acumen, and the defendants had neither." *Id.*, at 1202. The *Hollingsworth* facts are similar to this case in that the defendant had placed a legitimate advertisement to sell a Grenadian banking license, as Brace had with the prospectus, and the undercover agents played on his financial trouble to induce him into money laundering with instructions and money supplied by the government. *Id.*, at 1199-1202. There, as in Brace's case, the government made no effort at trial to show that a real money launderer would have responded to the legitimate advertisement, or prospectus in this case. *Id.*, at 1199. As in *Hollingsworth*, the government agents in Brace's case turned two harmless, though weak, foolish and greedy, men into felons. *Id.*, at 1202.

(Citations to the record omitted.)

These comments, and the cites to the non-binding decision in *Hollingsworth*, fall far short of presenting, for the first time on appeal (for which we would engage only in limited plain error review — as urged belatedly by the Government at en banc oral argument), the question of whether our court should add a "positional predisposition" element when the circumstances of a particular case might justify our doing so. For our court to do so would require breaking new ground. These comments in Brace's brief certainly did not ask the panel to do so, or flag in any real way that Brace was urging anything other than the standard, normal predisposition analysis.

This is confirmed by the fact that the Government's brief to the panel did not mention "positional predisposition". In this

28

regard, the now-vacated Brace-portion of the panel opinion stated: "The government, however, fails to address the positional and dispositional aspects of predisposition". *Knox*, 112 F.3d at 809 (vacated). Likewise, that now-vacated part of the panel opinion states: "[I]n its brief, the government fails to even cite *Hollingsworth*, let alone deal with it substantively". *Id*. at 809 n.12 (vacated).

However, as stated, a "positional predisposition" contention was never presented to either the district court or this court; therefore, there was no notice to the Government that it was at issue. As noted, *Hollingsworth*, decided before Brace's trial, was never cited in district court. And, even though Brace cited *Hollingsworth* in his brief to the panel, he did not sufficiently raise "positional predisposition". Therefore, it is most understandable both that the Government would not have understood it was at issue, and that, therefore, it did not feel it necessary to distinguish a Seventh Circuit opinion, which we had not (and have never) adopted, when our circuit already had existing, well-settled case law on entrapment.

In fact, the law of our circuit is at least arguably contra to the holding in *Hollingsworth*. *See United States v. Rodriguez*, 43 F.3d 117, 126-27 (5th Cir. 1995) ("The active, enthusiastic participation on the part of the defendant is enough to allow the jury to find predisposition."). We have consistently held that

29

"[a] prosecution cannot be defeated merely because a Government agent has provided the accused with the *opportunity or facilities* for the commission of the crime". *United States v. Williams*, 613 F.2d 560, 562 (5th Cir. 1980) (citing *United States v. Dickens*, 524 F.2d 441 (5th Cir. 1975), *cert. denied*, 425 U.S. 994 (1976)) (emphasis added); *accord United States v. Yater*, 756 F.2d 1058, 1062 n.6 (5th Cir. 1985), *United States v. Jones*, 693 F.2d 343, 347 (5th Cir. 1982), *United States v. Tobias*, 662 F.2d 381, 384-85 (5th Cir. 1981), *cert. denied*, 457 U.S. 1108 (1982), *United States v. Bradsby*, 628 F.2d 901, 904 (5th Cir. 1980).

It is noteworthy that Brace did not file a reply brief with the panel. Needless to say, had Brace felt "positional predisposition" was at issue, he should have filed a reply brief in order to comment on the Government's failure to address that point.

Accordingly, based on the above-stated pertinent excerpts presented in the district court and in Brace's brief to the panel, Brace did not sufficiently, much less specifically, raise the subissue of "positional predisposition" before either the district court or the panel. Moreover, even after the now-vacated Brace-portion of the panel opinion nevertheless adopted the "positional predisposition" element, Brace still does not appear, on rehearing, to contend that this subissue is necessary for his appeal. His lack of support for a separate "positional predisposition" element is even more significant in the light of the clerk of this court

30

advising counsel by letter that "the en banc court is primarily interested in the question of positional predisposition raised in the government's petition for panel rehearing".

In fact, Brace claims that this factor does *not* alter existing case law in this circuit. In his supplemental (en banc) brief, he states:

> [T]he panel's decision to apply the reasoning set forth in **Hollingsworth** to Brace's case does not conflict with or overturn a prior Fifth Circuit case on entrapment because it merely makes explicit a similar "readiness" analysis already employed in this Circuit.
>
> ....
>
> Perhaps, it is an imaginary and unnecessary line that is being drawn when the predisposition analysis is artificially divided into "mental" factors and "positional" factors.
>
> ....
>
> It is not necessary to adopt a new factor in the predisposition analysis, or to re-interpret **Jacobson** or set new precedent, in order to reverse Brace's convictions and correct the injustice. *While useful in a case like this, it is not even necessary to adopt the **Hollingsworth** "positional" predisposition analysis to reach the conclusion that Brace was entrapped as a matter of law. ... Brace's convictions can, and should, be reversed simply by following **Jacobson** and this Circuit's other entrapment cases.*

(Emphasis added.)

Similarly, at en banc oral argument, Brace's counsel seemed to disclaim reliance on "positional predisposition":

31

> **COURT**: Is it your position that the panel opinion in this case did or did not impose a new requirement on the government in entrapment cases in this circuit?
>
> **COUNSEL FOR BRACE**: *I don't think that it is a new requirement by imposition. I think it's another way of the government being able to establish to a jury the idea that a defendant had to [] be predisposed....*
>
> ....
>
> I don't think that it's a new element that had to be imposed or that was imposed by [the panel opinion].

(Emphasis added.)

Again, the new "positional predisposition" element, utilized by the panel, was neither preserved in district court nor raised for the first time on appeal. Apparently, Brace did not consider it a necessary subissue for the entrapment issue that was raised. And, neither before, nor even after, the vacated panel opinion has Brace specifically urged it.

It bears repeating — indeed, cannot be overemphasized — that we do not address issues not presented to us. And, even if, in taking a case en banc, we notify the parties of our interest in a particular issue addressed by the panel opinion, as we did in this case, that does not mean we can, or will, address that highlighted issue if we determine during en banc review that it was not presented on appeal to the panel. In sum, the vacated, quite short-lived "positional predisposition" element or subissue is not

before us, not even for limited plain error review.  Accordingly, we cannot address it.

2.

Consequently, the only issue presented by Brace relating to his entrapment defense is whether, under existing relevant precedent, the evidence was sufficient to prove, beyond a reasonable doubt, that he was predisposed to launder money.  As shown *supra*, this issue *was preserved* by Brace's judgment of acquittal motions.

As discussed, when the Government has induced a defendant to commit a criminal act, and the defendant raises an entrapment defense, the Government must prove that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.  **Jacobson**, 503 U.S. at 548.  We will reverse the verdict only if no rational juror could have found predisposition beyond a reasonable doubt.  **Byrd**, 31 F.3d at 1335.  The evidence presented at trial was more than sufficient to support the jury's implicit finding of no entrapment.

At trial, Brace summarized his defense in his testimony:  "I chose to launder money because I was presented with the approval of a ten million dollar loan that I desperately needed to pay the debts of the church.  That's why I laundered money."  But, he admitted that he would have laundered the money *even if* the undercover Agents had actually been drug traffickers.  Moreover, he

33

admitted that his wife told him to withdraw when she learned that he was accepting drug proceeds.

As described *supra*, Brace's church's financial difficulties were quite apparent by 1993; he first met with undercover Agents in March 1995. The evidence was sufficient to show that Brace was predisposed to launder money even before that first meeting, in which the $10 million offer was made. Wichita Teamsters Union President Landwehr testified that, several times in September 1993 (long before Brace first met the Agents) and after, Brace had asked if Landwehr had made contact with his "Mafia Friends". Raccuglia testified that, during staff meetings around April 1995, Brace asked a staff member from New York, who had an associate who was a nephew of John Gotti (who was convicted and sentenced to life imprisonment in 1992 for murder and racketeering), if he had any connections that would be useful in raising funds. Brace's wife would leave the room during these conversations regarding "connections", commenting that she did not want to hear it. Landwehr and Raccuglia testified that, in this context, they had heard Brace state, on different occasions: "The wealth of the wicked is laid up for the righteous".

As discussed *supra*, in early March 1995, prior to Brace's first meeting with the Agents, Agent Cisneros recorded telephone conversations with Clarkston, in which Clarkston stated that he had a "major big time guy" from "a church group" who was "very

34

interested" in meeting with Agent Cisneros and would like to "close" the next weekend. During a meeting on 17 March 1995, between Agents Gonzalez and Cisneros and Clarkston, Clarkston told them that he knew a minister interested in laundering money and that the minister's financial advisor was already in town and wanted to meet with them. Agents Gonzalez and Cisneros testified that, when they asked Clarkston whether the minister knew that Agent Gonzalez was a cocaine dealer looking to launder the proceeds from cocaine sales, Clarkston informed them that the minister knew about the source of the funds and did not care.

Later that same day, during a meeting between the Agents, Clarkston, and Knox, the Agents informed Knox, early in the conversation, that Agent Gonzalez was a Colombian drug trafficker and that the deal involved laundering money from cocaine proceeds. Agent Gonzalez testified that Knox responded that he and the minister were aware of this and were not concerned about the source of the money.

The above evidence, produced at trial, was more than sufficient for the jury to conclude that Brace was predisposed to launder the money *before* his first meeting with the Agents, in which the $10 million offer was made. With respect to that first meeting, as stated previously, the Agents offered the $10 million before explaining that the money came from drug trafficking; but, as demonstrated above, the evidence was sufficient for the jury to

35

conclude that Brace was already aware of the source of the money.

Moreover, during this same meeting, Agent Cisneros stated "that the money is from the sale of cocaine trafficking. That it is narcotics money. ... [Undercover Agent Gonzalez] is asking you to launder money". Brace immediately responded: "I don't have a questionnaire ... where these monies come from" and that he had received funds "from sources that, uh, would be questionable". Brace stated later in the meeting: "I appreciate the fact that you want to be very straight forward and up front with me. ... but, uh, that does not concern me, really".

Again, for an entrapment issue, our focus is on whether the defendant was disposed to commit the criminal act *prior* to the first contact by the Government. *Jacobson*, 503 U.S. at 548. But, it is equally clear that "[e]vidence of the defendant's *ready response to the solicitation*, as well as evidence of *independently motivated behavior* that occurs *after* government solicitation begins, can be used to prove that the defendant was predisposed, *i.e.*, ready and willing to [commit the crime] even before he was contacted by the government". *Byrd*, 31 F.3d at 1336 (emphasis added).

The evidence sufficiently showed that Brace's predisposition was evidenced throughout the undercover operation. At the second meeting between Brace and the Agents, in which Brace took the first $100,000 test amount, Brace clearly understood that the funds were

36

proceeds from the sale of cocaine and that he was being asked to money launder such funds.  In fact, he took the money even after the Agents told him that they had "crossed" three tons of cocaine into the United States the previous day.

Raccuglia testified that, in April 1995, after Brace returned to Kansas with the first test amount, Brace told him that the money came from Colombian drug dealers; that the money was an advance on $10 million; and that this was a test of his ability to transfer the funds.  Brace told Raccuglia that the drug dealers stored the money in stash houses, and had brought in a large shipment of cocaine; but, that he was not concerned about the source of the money, because he had received "authorization from God".  Raccuglia testified that Brace had said, "I've heard from God like I've never heard before".  Brace also talked with Raccuglia about installing a safe in his church office and getting a separate security system.

After the second test transfer, Brace discussed with Raccuglia and another staff member about opening a storefront check cashing service in order to convert cash to checks while avoiding the reporting requirement.

In sum, under existing relevant precedent, the evidence produced at trial, highlighted above and detailed at the outset of this opinion, is more than sufficient for a rational juror to conclude, beyond a reasonable doubt, that Brace was predisposed to launder money.  See *Byrd*, 31 F.3d at 1335.

37

B.

As noted, Brace did not object at trial to Fifth Circuit Pattern Instruction No. 1.28, concerning entrapment. Accordingly, in belatedly challenging it now, he concedes, as also noted, that, to prevail on this issue, the instruction must have constituted plain error. FED. R. CRIM. P. 52. Because the panel found that Brace was entrapped, it did not address this issue with respect to him; it did with respect to Knox.

As also noted, following Brace's trial, a panel of our court, in *Hernandez*, 92 F.3d at 311, held that the entrapment pattern jury instruction, identical to that given Brace's jury, is correct under *Jacobson*. In fact, as discussed *supra*, Knox likewise failed to object to the jury instructions and raised an argument identical to Brace's before the panel; the panel also held that *Hernandez* controls. *Knox*, 112 F.3d at 810 (non-vacated portion).

In short, there was no error, much less plain error. *See, e.g., Calverley*, 37 F.3d at 162-64 (holding that plain error requires error that is obvious, clear, or readily apparent, and that affects substantial rights; and that, even if these conditions are satisfied, reversal of such error is discretionary).

C.

In his brief to the panel, Brace contested his sentence on three bases. Again, because the panel vacated Brace's conviction, it did not address his sentence.

38

1.

First, Brace contends that he should have been given a downward departure, due to Government manipulation. *See* U.S.S.G. §§ 2D1.1, App. Note 17 and 5K2.12; 18 U.S.C. § 3553(b). The district court may depart downward from the sentencing range prescribed by the guidelines based on mitigating circumstances "of a kind, or to a degree, not adequately taken into consideration by the ... guidelines". U.S.S.G. § 5K2.0.

> We may only review a trial court's refusal to grant a downward departure from the Guidelines if the refusal was based on a violation of the law ... Thus, we have jurisdiction if a district court's refusal to depart downward is premised upon the court's mistaken conclusion that the Guidelines do not permit such departure, but we have no jurisdiction if the court's refusal is based on its determination that departure is not warranted on the facts of the case.

*United States v. Palmer*, 122 F.3d 215, 222 (5th Cir. 1997) (citing *United States v. Mitchell*, 964 F.2d 454, 462 (5th Cir. 1992)); *see also United States v. Lugman*, 130 F.3d 113, 115 (5th Cir. 1997).

Brace claims that the Government intentionally manipulated his sentence by inducing him to launder three "test" amounts ($100,000, $100,000, and $150,000) as a precondition to receiving the $10 million that he was really seeking. These amounts mirror the sentence increases in U.S.S.G. § 2S1.1(b)(2). Brace asserts further that the Agents could have arrested him after any one of

the illegal transfers, but instead were interested in "running up the tab".

But, Brace does not contend that the denial of a downward departure was "premised upon the court's mistaken conclusion that the guidelines do not permit such departure". *See Palmer*, 122 F.3d at 222. Accordingly, we lack jurisdiction to review the court's discretionary conclusion. *See Lugman*, 130 F.3d at 115.

2.

a.

Brace next maintains that the district court erred by denying a three-level reduction in his base offense level because, at the time of arrest, he and his co-conspirators had not completed all the acts believed necessary to launder the $10 million.

Knox made an identical contention to the panel, and it found no error. *Knox*, 112 F.3d at 812-13 (non-vacated portion). For the reasons stated in the panel opinion with respect to Knox, we conclude that the district court did not clearly err in denying the three-level reduction with respect to Brace. *See id.*

b.

In conjunction with the above non-completion contention, Brace also appears to contend that the district court incorrectly applied the money laundering guideline, U.S.S.G. § 2S1.1, to the conspiracy offense, resulting in an incorrect sentence. *See* 18 U.S.C. § 3742(f). Brace did not make this contention during sentencing;

40

therefore, we review only for plain error. *Calverley*, 37 F.3d at 162-64.

Brace concedes that the district court correctly applied § 2S1.1 to the three substantive money laundering counts (totaling $350,000), but asserts that it erred by also applying it to the conspiracy count (totaling $10 million). The aggregated amounts of these four counts resulted in a nine-level increase in Brace's base offense level (for more than $10 million), rather than a two-level increase (for more than $200,000).

Brace relies on U.S.S.G. § 2X1.1(c), which provides that "when an attempt, solicitation or conspiracy is *expressly* covered by another offense guideline section, apply that guideline section". (Emphasis added.) Application Note 1 to § 2X1.1 lists the attempts, solicitations, and conspiracies that are explicitly covered by the guidelines, and § 2S1.1 is not listed. Therefore, Brace contends, the district court should have applied § 2S1.1 to the three substantive counts and § 2X1.1 to the conspiracy count. Brace maintains that this would result in an offense level of 25 for the three substantive counts under § 2S1.1 and an offense level of 23 for the conspiracy count under § 2X1.1. Consequently, Brace contends, the grouping of multiple counts under § 3D1.2(b) would result in an overall level of 25, with a corresponding sentencing range of 57 to 71 months, rather than the 175 month sentence he received.

41

Brace was convicted on charges brought under 18 U.S.C. § 1956(h) (conspiracy to launder money) and 18 U.S.C. § 1956(a)(2)(B)(i) and (a)(3)(B) (money laundering). In sentencing, the conspiracy and substantive counts were properly grouped pursuant to U.S.S.G. § 3D1.2. The statutory provision for conspiracy, 18 U.S.C. § 1956(h), provides: "Any person who conspires to commit any offense defined in this section ... shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

Accordingly, in determining Brace's sentence, the district court did not plainly err by applying § 2S1.1 to the conspiracy and substantive counts.

3.

Finally, Brace contends that, because of his acceptance of responsibility, he is entitled to a two-level decrease in his base offense level. Of course, whether the defendant demonstrates such acceptance is a factual question; in fact, we will overturn the district court's finding on that question only if it is without foundation. *United States v. Perez*, 915 F.2d 947, 950 (5th Cir. 1990); *see also United States v. Rickett*, 89 F.3d 224, 227 (5th Cir.), *cert. denied*, ___ U.S. ___, 117 S. Ct. 499 (1996); *United States v. Vital*, 68 F.3d 114, 121 (5th Cir. 1995) (giving "great deference" to the district court's acceptance of responsibility findings).

42

Brace relies on U.S.S.G. § 3E1.1(a), which provides for the two-level decrease "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense". Application Note 2 provides, in pertinent part:

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In *rare situations* a defendant may *clearly* demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that *do not relate to factual guilt* (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). *In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.*

(Emphasis added.)

Brace claims that he satisfied § 3E1.1 because he went to trial only to preserve the "legal issue" of entrapment. Along this line, he notes that he fully admitted, in his pretrial confession and trial testimony, to his "factual guilt".

The Government responds correctly that, although Brace admitted committing the criminal *acts*, his assertion of entrapment was a denial of factual guilt, because it is a denial of subjective predisposition and, consequently, of the required element of *mens rea*.

In other words, an entrapment defense is a challenge to criminal intent and thus to culpability. Accordingly, this is not

43

one of those "rare situations", contemplated by the guideline commentary, in which a defendant may proceed to trial and still satisfy § 3E1.1(a).

## III.

Possibly, there remains for another day and another case the issue of whether, under the appropriate circumstances, the Government must prove "positional predisposition" when an entrapment defense is raised. That issue was not presented in this case; therefore, mindful of our limited and proper role, we do not address it. With that issue not being in this case, we are faced instead with a straightforward application of well-established and understood precedent as to entrapment and sentencing. For the reasons given, the judgment as to Brace is

*AFFIRMED.*

44